**WEEKS DREDGING &
CONTRACTING, INC.,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 694–84C.**

United States Claims Court.

Aug. 28, 1987.

David C. Romm, Vienna, Va., attorney of record for plaintiff. Robert G. Watt, David Mancini, and Watt, Tieder, Killian & Hoffar, of counsel.

Elizabeth Woodruff, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

OPINION

REGINALD W. GIBSON, Judge:

I. *Introduction*

This is a Type I differing site condition case. However, it is *not* one in which the differing conditions primarily relate to the character or nature of the subsurface materials encountered versus such materials depicted in the contract documents. To the contrary, the conditions averred to have been encountered here, and which are allegedly materially different from contract depictions, relate to *excess quantities* of gravel, eutaw, and *unanticipated sizes* of gravel. *See The Arundel Corporation v. United States*, 515 F.2d 1116, 207 Ct.Cl. 84 (Ct.Cl.1975). In short, we find that plaintiff, in its effort to prove its claim(s) of differing site conditions, has failed to properly compare the *quantum* of certain subsurface materials allegedly depicted by contract documents, within the maximum pay template, with the *quantum* of all such materials actually dredged from within that *same* site. As is explained *infra*, plaintiff's affirmative obligation to do so, we feel, is an imperative in order to enable this court to determine—whether there are any material quantum differences (between anticipated and actual dredged materials) within the *same* contract site (*i.e.*, the maximum pay template). Jurisdiction in this court is premised on § 1491, Title 28 U.S.C.

Our opinion embodies the court's final decision on all issues and claims raised by the plaintiff's, Weeks Dredging & Contracting, Inc.'s (Weeks), petition of December 26, 1984. This decision follows an exhaustive five-week trial (August 7—September 10, 1986) which resulted in well over 5,000 pages of transcript and almost two hundred exhibits—many of which consisted of multiple pages. Several interlocutory orders [1] have also been issued, tracing an equally exhaustive period of pre- and post-trial motions and briefs. We now address the substantive issue(s) raised during said trial and concomitantly refer the reader to the more detailed account of proce-

---

[1] See Orders dated: September 11, 1986; September 23, 1986; September 29, 1986; October 8, 1986; October 27, 1986; December 8, 1986; and June 1, 1987.

dural events found in *Weeks Dredging & Contracting, Inc. v. United States*, 11 Cl.Ct. 37 (1986).

Weeks, the plaintiff-contractor, seeks, in the first of its two causes of action, an equitable adjustment in the aggregate amount of $3,599,171.72 based on three distinct differing site conditions it allegedly encountered in the performance of a multi-million dollar dredging contract with the U.S. Army Corps of Engineers (Corps). Said contract was for channel and harbor virgin dredging on the now completed Tennessee-Tombigbee Waterway (Ten-Tom) [2] in the southeastern United States. Plaintiff seeks to prove (as its first cause of action) that, while performing on contract number DACW 01–79–C–0125 (awarded April 2, 1979), it encountered (1) quantities of gravel, (2) quantities of eutaw,[3] and (3) sizes of gravel, all materially *in excess* of what was reasonably discernible from the contract boring logs [4] furnished by the Corps with the Invitation For Bids (IFB).[5] As a consequence of the foregoing, plaintiff claims that it took an *additional* 195 dredging days in which to complete the contract *beyond* the 413 dredging days that the job should have taken had the subsurface conditions been as depicted by the contract boring logs. The excess cost allegedly incurred for these additional 195 days is the $3,599,171.72 claimed as an equitable adjustment.

As its second and last cause of action, Weeks seeks to recover interest only, pursuant to the Contract Disputes Act, 41 U.S.C. § 601 *et seq* (1982) (CDA), on a separate differing site condition claim, also arising out of the Ten-Tom project, which

Weeks previously settled with the Corps in June, 1984.[6] This previously-settled differing site condition claim was based on delays due to unanticipated stumps and logs found at the project dredging site. In settlement of said claim, the Corps paid Weeks interest on the equitable adjustment running from July 7, 1983 to June 24, 1984, the date of settlement, on the theory that the stump claim was not properly certified, pursuant to the CDA, until July 5, 1983. Before this court, Weeks seeks additional interest, with respect thereto, running from a previous date it claims to have properly certified said claim, *i.e.*, October 29, 1982, until the date of certification currently acknowledged by the Corps as July 5, 1983.

At the trial, the defendant's opposition strategies centered around proving two fundamental defensive theories: first, that certain and various debilitating circumstances surrounding Weeks' *own performance* were the actual as well as the concurrent causes of the 195-day delay; and secondly, that there were in fact no site conditions encountered reasonably and materially differing from those depicted in the Invitation For Bids and specifications. With regards to concurrent causes for delay, defendant stressed: (a) that plaintiff failed to conduct a reasonably *adequate* pre-bid site investigation; (b) that Weeks failed to *reasonably* interpret the contract documents, including the contract boring logs; and (c) that Weeks utilized an inexperienced and poorly-qualified work force, poor dredging technique, as well as substandard dredging equipment. In opposing plaintiff's differing site condition claim(s), defendant also

2. The Tennessee-Tombigbee Waterway joins the Tennessee and Tombigbee Rivers to form a continuous water route stretching from Kentucky to the Gulf of Mexico, parallel to the Mississippi River. The Waterway crosses the states of Tennessee, Missouri, and Alabama. For more detailed background and history, *see* Patterson, *The Tennessee-Tombigbee Waterway: Bounty or Boondoggle?*, National Geographic, March, 1986, at 364.

3. Eutaw is a soil material found primarily in the southern United States. It is a compacted gray, clay-like material which is often very hard. Joint Glossary of Technical Terms (JGl) filed July 29, 1986 at 8; Tr. at 573–74.

4. Boring logs are the recorded data depicting the boring samples, and usually describe the boring samples by words and symbols. Borings are a field sampling procedure whereby subsurface soil information is acquired through drilling or driving a sampling device. The boring logs may state the depths of the various materials, depth of the boring sample, location and top elevation of the boring hole, and any other gathered information. JGl at 1–2.

5. *See* Plaintiff's Exhibit (PX) 1 at appendix.

6. *See* Defendant's Exhibit (DX) 7.

relied on its own post-dredge test pit study to call into question the reasonableness of plaintiff's *visual estimates* of the quantities of the various materials actually dredged.[7]

At closing arguments, the defendant focused its *primary* argument(s) from the foregoing (while not abandoning the same) and now emphasizes what it perceived to be a more fundamental failure of proof by the plaintiff. According to defendant, it is a simple fact that plaintiff's case is fatally flawed in that all of plaintiff's proof relates to an alleged differing site condition occurring at the *wrong* site. Instead of posturing its differing site condition claim by comparing the various *estimated* materials within the contract site (*i.e.*, the maximum pay template) with the same categories of materials *actually* dredged *in that same contract site* (as it must), plaintiff erroneously compared, avers defendant, the categories of *estimated* materials within the maximum pay template, with the categories of materials *actually* dredged in the contract site *plus* an area of admitted 20 to 25% overdredging occurring *outside* of the contract site.[8] Plaintiff's failure to factor out the quantum of "non-pay" materials it dredged *outside* the maximum pay template, from the "pay" materials it dredged *within* the contract site, leaves the court with no relevant comparative basis by which to test for the existence of any material differing site condition occurring *within the relevant contract site.*

Defendant also posits three barriers to the plaintiff's claim for additional interest on the now-settled stump claim. First, defendant claims that plaintiff's alleged certification in October of 1982 was faulty as a matter of law. Secondly, even were that certification proper, federal regulations prohibit the government from paying additional interest on claims resolved by private settlement. Lastly, defendant asserts that as a matter of law, on the basis of the settlement agreement entered into on the stump claim, plaintiff is barred by the doctrine of accord and satisfaction on any claims plaintiff had, or may now have, relative to the stump award.

After thoroughly reviewing all of the evidence in the record, we are of the opinion that plaintiff is not entitled to an equitable adjustment based on differing site conditions for excess gravel, excess eutaw, and oversize gravel. While all of our reasons for this decision are set out more fully below, the primary, *but not the only*, basis for our decision is the failure of proof. In essence, try as we did to find probative evidence in the record which would permit us to make a valid comparison between materials expected (indicated by the IFB) and materials truly dredged, all *within* the actual contract area, we are forced to conclude that plaintiff has simply failed to adduce fundamental proof of the latter element, *i.e.*, the quantum of the various materials actually dredged *within* the relevant contract (maximum pay template) area. In addition, we further find plaintiff's count II claim, for interest on the previously-settled stump claim, to be barred as a matter of law. Accordingly, plaintiff's entire petition is dismissed.

## II. *Background Facts*

The plaintiff Weeks is a long-time participant in the field of dredging. Since its formation, in 1962, Weeks has evolved from a low-tech clam shell dredging operation to a firm capable of more sophisticated dredging techniques such as the hydraulic

---

**7.** This post-dredging test pit study included samples taken from five "spoil" areas—the areas into which dredged material was dumped—which were then analyzed and used as a basis to estimate the *quantities* of the various dredged materials which actually existed in certain cut areas below the surface of the river *prior* to dredging. *See* PX 40; DX 79; Tr. at 3292–3350, *passim.*

**8.** In a Motion For Leave To File A Supplemental Brief filed on June 29, 1987, plaintiff sought to preclude defendant from defending on said grounds allegedly because "[d]efendant raised [said] issue in closing argument which it never previously asserted." The court by its order dated July 2, 1987, denied plaintiff's foregoing motion (in spite of the fact that plaintiff conceded that "defendant's allegation is potentially a bar to any recovery") because it found that defendant clearly and unequivocally raised said issue in both its pre- and post-trial submissions.

pipeline system which was utilized in performing the contract in issue.[9] Weeks' experience, however, has been relatively extensive, spanning both virgin cut and maintenance dredging, and involving, since 1961, some 70 to 75 jobs for other Corps districts.[10] Interestingly enough, the record reflects that in not one of those Corps' jobs, or in any other job, has Weeks ever had a single contract claim filed with a court, a board of contract appeals, an arbitration panel, or any other tribunal.[11]

Weeks' competence as a viable dredging contractor is reflected in the extensive experience of its main or key personnel. The main force behind Weeks' expansion into the hydraulic dredging field was Weeks' vice-president, Mr. Dwight Rice, the project manager on the Ten-Tom contract.[12] Mr. Rice joined Weeks in 1976, bringing with him 16 years of experience in hydraulic dredging.[13] During those 16 years (1960–75), prior to joining Weeks in 1976, Mr. Rice had personal "hands-on" experience in the actual performance of over 25 dredging jobs, including involvement in bid preparation and pre-bid site investigations on roughly 100 bids.[14] Overall, prior to the award of the Ten-Tom contract in 1979, Mr. Rice's experience had spanned jobs with many of the precise characteristics found in the Ten-Tom project, to wit, virgin cut and river channel dredging, gravel and sand dredging, and dredging at shallow depths in the neighborhood of 10–12 feet.[15] In addition, the record reflects that Mr. Rice was no novice to Corps dredging procedures, having gained 70–80% of his "hands-on" dredging experience on projects contracted by the Corps.[16]

Also of critical importance to Weeks' performance on the Ten-Tom project was the *superintendent* of the dredging vehicle used on the project, Captain Glenn Harris.[17] Captain Harris was primarily responsible for the day-to-day operations of the dredge Venture during the performance of the contract.[18] Evidence in the record indicates that he was a highly experienced dredgeman, with over 35 years of experience in the field, reflecting work exposure from the lowest job on a dredge to his lofty position as dredge superintendent on the Ten-Tom job.[19] Like Mr. Rice, Captain Harris' experience similarly spanned prior contracts with the precise characteristics of the contract in issue, to wit, dredging hard rock material like eutaw, and dredging a river channel.[20]

Word of the existence of the Ten-Tom project reached Weeks in late 1978, and following thereon the IFB (# DACW 01–79–B–0039) was received in early January 1979.[21] The IFB initially contained, in addition to the usual drawings, maps, and specifications, some 152 boring logs which purported to depict and describe the actual subsurface conditions (*i.e.*, materials) in the area proposed to be dredged.[22] Shortly thereafter, the IFB was amended to cover additional dredge work, and as a consequence was supplemented with four additional boring logs, bringing the total number of boring logs to 156.[23] In sum, the *IFB*, as amended, described a vast dredging project consisting of approximately 7,789,200 cubic yards of materials to be dredged, interspersed over various discrete

9. Tr. at 59–60.

10. Tr. at 160, 164, 168; Joint Stipulation (JS) ¶ 3.

11. Tr. at 68.

12. JS ¶ 4.

13. Tr. at 465.

14. Tr. at 493, 479.

15. Tr. at 489–92, 918–19.

16. Tr. at 578.

17. JS ¶ 6.

18. JS ¶ 6.

19. Tr. at 349–60.

20. Tr. at 361, 363.

21. JS ¶ 23; Tr. at 344.

22. *See* PX 1; *see supra* note 2.

23. *See* PX 1, PX 20, PX 21.

areas spanning an aggregate distance of approximately 30 river miles.[24]

This 7,789,200 cubic yard figure represented what was known to the parties as the "maximum pay yardage."[25] To understand the significance of this term, it is important to briefly explain how a Corps dredging job is defined for payment purposes. The yardage as to which the contractor is required to dredge, and for which the contractor will be paid, is called "pay yardage."[26] In contrast, excess yardage which is dredged outside of the maximum pay template, for which the contractor will *not* be paid, is called "non-pay yardage." Not surprisingly, the contract specifically provided that to the extent the contractor's reported pay yards included yards dredged from non-pay locations, this excessive overdepth material excavation or excessive side slope excavation of subsurface materials would be deducted from the total pay yards.[27]

The "pay yardage" is found within the confines of what is called the "pay template." The "pay template" is a cross-section of the area (river channel) to be dredged which looks like the side view of an open box with upward sloping sides. As would logically and necessarily follow, outside of this "pay template" is all non-pay yardage. The "required pay template" is the *minimum* area within the pay template required to be dredged by the contractor pursuant to the contract specifications, *i.e.*, the desired river channel.[28] The "maximum pay template" is the required pay template *plus* an allowable *one foot* of pay overdepth at the bottom of the cut.[29] This additional one foot of pay yardage, which

extends the "required pay template" into the "maximum pay template" is provided for the convenience of the contractor to minimize the extra cost the contractor would inevitably incur in overdredging a minimal amount in order to ensure that the required pay template was met.[30]

The Corps' *estimated* figure of 7,789,200 cubic yards, which represented the maximum pay yardage, therefore, included the one foot of allowable pay overdepth.[31] Needless to say, therefore, this 7,789,200 figure did not contemplate non-pay yardage. As is noted, *infra,* this initial Corps estimate of 7,789,200 cubic yards of maximum pay yardage was subsequently reduced to 6,557,518 cubic yards after Weeks was awarded the contract, but prior to the time Weeks commenced dredging.[32] From a pre-dredge survey by the Corps, made in late 1979, this reduction in maximum pay yardage (*i.e.*, 1,231,682 cy) was determined to have resulted from extensive flooding which occurred sometime after the original estimate of pay yardage was made in 1972 or 1973, but prior to Weeks' actual commencement of dredging in January 1980.[33] Despite this massive (16%) reduction in maximum pay yardage of subsurface materials which Weeks did not have to dredge, the total contract price remained the amount of plaintiff's bid for which it was paid in full, $9,329,228.00.[34]

Testimony by one of Weeks' officials described the Ten-Tom contract as one which was "ideal" for Weeks to bid.[35] Accordingly, in order to prepare and submit a reasonable bid, Mr. Rice, after reviewing the contract documents, undertook a trip to the

24. JS ¶ 26. The actual dredging within this 30 mile stretch, however, was some 16.78 miles. JS ¶ 60.

25. JGl ¶ 15.

26. JG1 ¶ 16.

27. PX 1 at 2A–10, ¶ 10.3. Section 10.3 provides, in relevant part: "10.3 *Excessive excavation:* Material taken from beyond the limits as extended in the Paragraphs: *Overdepth* and *Side Slopes* above will be deducted from the total amount excavated as excessive overdepth excavation or excessive side slope excavation for which payment will not be made...."

28. JGl ¶ 21.

29. JGl ¶ 14.

30. *See* Definitions JGl ¶ s 14, 21.

31. PX 1 at BS–1.

32. JS ¶ 52.

33. JS ¶ 53.

34. JS ¶ 39.

35. Tr. at 76.

project site in order to allegedly investigate more fully the physical surroundings described in the IFB.[36] This venture, commonly known as the "pre-bid site investigation," was conducted over a four to five day period and included both walking parts (approximately one third of the project's 30 river miles) of the shore line along the Ten-Tom River, as well as repeated over flight aerial observations of the *entire* project site from a small plane rented for said occasion.[37] Mr. Rice testified that during the pre-bid site investigation, he sought out land and shore line routes to transport supplies to the dredge Venture when out on the river, questioned residents regarding local labor requirements, and visually compared the contract maps and boring logs with the areas of the project site that he reached by foot.[38] On the basis of said investigation, Mr. Rice further testified that he believed there to be a good "correlation" between the contract documents and exposed areas of the project site.[39] However, he candidly characterized his site investigation as limited to spot-checking, and in some instances to be a "superficial inspection." [40]

Using the available information contained in the IFB (in particular the contract boring logs), as supplemented by his site investigation, Mr. Rice prepared Weeks' bid. The record reflects that Weeks' bid preparation activity was a process requiring many detailed documented estimates reflected on several charts and diagrams. Principle to this bid preparation process,

however, were certain key and indispensable documents. First, Weeks prepared what was described as a "subsurface soils profile." [41] A soils profile is a "map," of sorts, which purports to depict the project site according to the *type* of subsurface materials expected to be dredged.[42] The soils profile is based on the Corps' contract boring logs and is an extrapolation performed by the contractor using the Uniform Soil Classification Systems (USCS).[43] Using the materials categories and composition ranges found in the USCS, Weeks was then able to quantify the total cubic yards of each identifiable material to be dredged, *infra.* [44] Premised on the boring logs, Weeks identified five categories of materials to be dredged in its soils profile, which categories were arranged according to the production rate at which they could be "pumped" or dredged.[45] Those five categories, arranged and identified from the easiest to the most difficult to pump, were: (1) sand, (2) sand and gravel, (3) gravel with sand, (4) clays, and (5) eutaw.[46]

As noted *supra*, using the foregoing soils profile and the USCS, Weeks calculated the total estimated quantity of each of the foregoing categories of materials expected to be dredged.[47] We summarize below, from the bid documents, an overview of the total quantities of each material that Weeks expected to encounter on the Ten-Tom contract project as allegedly depicted by the boring logs:

**36.** Tr. at 616–17; JS ¶ 58.

**37.** JS ¶ 58; Tr. at 626, 629.

**38.** Tr. at 616–648.

**39.** Tr. at 630–31.

**40.** Tr. at 1084, 1100.

**41.** Tr. at 648; PX 17.

**42.** *Id.;* Tr. at 656.

**43.** Joint Glossary at p. 5, ¶ 32, defines the USCS as: "A system of soil classification based, in large part, on soil grain size characteristics." The USCS's descriptive terms assume a quantita-

tive range in its definitions. For example, a subsurface material, *i.e.*, "sand" preceding a descriptive term such as—"some," "little," or "trace" followed by the noun "gravel" contemplates a range of 20% to 35%, 10% to 20%, and 1% to 10%, respectively, of gravel.

**44.** Tr. at 691–700; PX 18; PX 19.

**45.** Tr. at 672.

**46.** *See* PX 17.

**47.** Tr. at 691–700; PX 18; PX 19.

| Class Of Material | Estimated Quantity Based On Contract Boring Logs |
|---|---|
| Sand | 4,663,850 CY |
| Clay | 2,299,675 CY |
| Sand with little to some gravel | 562,500 CY |
| Gravel with some sand | 771,800 CY |
| Eutaw | 62,350 CY |
| TOTAL | 8,360,175 CY [48] |

A cursory inspection of this chart reveals that Weeks' own estimate of the maximum pay yardage actually exceeded that anticipated and initially provided by the Corps in the IFB (*i.e.*, 7,789,200 vs. 8,360,175).

Having determined what *it* perceived to be the estimated total cubic yard quantities of the various materials depicted to be dredged by the boring logs (8,360,175 cy), Weeks next proceeded to calculate the total operating dredge hours needed to complete the job—the figure to which they could then apply hourly cost, overhead, and finally a mark-up factor to arrive at their bid price.[49] This calculation was based on a specialized formula known to Mr. Rice from his 16 years of hydraulic dredge experience *prior* to joining Weeks.[50] At the core of this formula was a series of pumpability rates, expressed in cubic yards per hour, for *each* class of materials to be dredged.[51] These pumpability rates were themselves derived directly from actual data generated during years of hydraulic dredging by the firm with whom Mr. Rice was employed prior to joining Weeks.[52] In order to perform the calculation of estimated total dredge hours, Mr. Rice first grouped the project into subcomponents according to the location of the nearest disposal site.[53] This was done because, as noted *infra*, dredge productivity (measured by cubic yards of materials pumped per hour) is directly affected by both the length and the lift of the disposal pipeline from the dredge to the disposal area.[54] Once appropriately grouped, Mr. Rice then pro-

ceeded to calculate the estimated total dredge time for each such sub-component.

Beginning with the basic pumpability rates described *supra*, Mr. Rice first performed a series of adjustments, for each sub-component and each class of materials to be dredged, to take into account a variety of factors he believed limited dredge productivity. Those factors included—(i) the type of material to be dredged; (ii) the location of the material to be dredged; (iii) the length of the discharge line from the dredge to the disposal area; and (iv) the lift of the discharge line between the dredge Venture and the disposal area.[55] Once appropriately adjusted, these pumpability rates were then divided into the corresponding figure representing the total cubic yards of the particular class of materials to be dredged in that sub-component.[56] Totalling these quotients, expressed in hours, Mr. Rice arrived at the figure representing the estimated dredge hours necessary for each sub-component.[57]

Before adopting the previously-mentioned estimated dredge hour figure as the official sub-component dredge time to be used in determining its bid, one additional limiting factor was considered. This factor was the time it would take the dredge itself to move in and out of position to accommodate the lateral sweeps of the suction pump and cutter (the actual dredging mechanism) as the dredge proceeded to move along the river channel.[58] This calculation, in essence, required a comparison of the rate of the dredge sweep versus the rate at which the dredge could move to accommodate that sweep. If the sweep time, expressed as the estimated dredge hours calculated *supra*, was greater than the dredge moving or "walk" time, then the estimated dredge hours calculated *supra* became the official estimated dredge time for the par-

---

48. PX 26.

49. Tr. at 709; PX 22.

50. Tr. at 721–23.

51. *Id.*

52. *Id.*

53. Tr. at 726–27.

54. Tr. at 720, 742–43.

55. Tr. at 719–50; PX 22, columns 3–6, 14.

56. PX 22, columns 15, 16.

57. *Id.*

58. PX 22, columns 15 and 16; Tr. at 720.

ticular sub-component.[59] This was known to Mr. Rice as "yardage governs."[60] On the other hand, if the estimated dredge hours calculated *supra, i.e.,* the sweep time, were less than the time it would take to "walk" the dredge to accompany that sweep, then the dredge "walk" time became the official estimated dredge time for the particular sub-component.[61] This was known to Mr. Rice as "advance governs."[62]

Having sorted out yardage governs versus advance governs for each sub-component, Mr. Rice was able to arrive at his best estimate for dredge *days* necessary to complete each sub-component. This was done by taking the official gross estimate for dredge *hours,* and dividing that figure by the number of dredge hours available in a given day.[63] Where yardage governs, Mr. Rice believed a pace of 18 hours of dredging per day was reasonable.[64] For advance governs, a slower pace of only 15 hours of dredge time per day was believed by Mr. Rice to be obtainable.[65] However, on a weighted average basis, Weeks estimated 15.93 hours of dredging per day across the entire project to be reasonably obtainable.[66] This circumstance, in turn, necessarily resulted in approximately 8.07 hours of anticipated "down time" per day.[67] Weeks then converted these "day" figures for each sub-component into months (based on a thirty day month), and by totalling the "month" figures, arrived at a total estimated dredge time of 19.4 months for the entire project as being obtainable.[68] Adding thereto several additional days for certain anticipated contingencies, the total estimated dredge time actually used in the bid rose to 20.4 months.[69]

Weeks completed the bid time estimate analysis described *supra* sometime in early February, 1979. The 20.4 months time period estimated to dredge the entire project (8,360,175 cy) was then translated into a monetary bid of $9,329,238.00.[70] Using that figure, Weeks submitted its bid to the Corps on February 22, 1979.[71] Short of two months later, on April 2, 1979, Weeks received notice that it had been awarded the contract.[72]

It is worthy of note that, since 1976 or 1977, Weeks had been keenly interested in starting a hydraulic dredge operation, but even as late as the award of the contract on April 2, 1979, it had yet to actually purchase an acceptable dredge.[73] However, Weeks began looking, in the middle of 1978, at the hydraulic dredge it would later purchase to perform on the Ten-Tom contract.[74] The dredge in question, then styled the "Western Hunter," later renamed by Weeks after acquisition as the "Venture," was at that time located at Marco Island, Florida.[75] The first inspection of the Western Hunter, in 1978, was made by Weeks' personnel, Messrs. Rice

---

**59.** PX 22, columns 15 and 17 ("yardage governs"); Tr. at 748–50.

**60.** PX 22, column 15.

**61.** PX 22, columns 16 and 17 ("advance governs"); Tr. at 750–53.

**62.** PX 22, column 16.

**63.** PX 22, column 18.

**64.** Tr. at 753.

**65.** Tr. at 754.

**66.** Tr. at 764.

**67.** *Id.;* 24 hours a day minus 15.93 dredge hours equals 8.07 hours down time per day.

**68.** PX 22, p. 5.

**69.** PX 22, p. 5; Tr. at 763–64. These contingencies consisted of one additional day per month for breakdowns, and an additional 16 hours for each of 16 "major moves" of the dredge along the river. Lastly, the record reflects that Weeks, in fact, revised its dredge time estimate once again *after* being awarded the contract, *i.e.,* four-tenths (.4) of a month was subtracted as Weeks later hired a subcontractor who worked contemporaneously with Weeks to complete dredge work on one marina area along the project. *Id.*

**70.** JS ¶ 39.

**71.** JS ¶ 25.

**72.** JS ¶ 39.

**73.** Tr. at 71.

**74.** Tr. at 581.

**75.** *Id.*

and Bergmann, who visited its then captain, Glenn Harris.[76] This initial visit was hospitably characterized as "a good general overview" of the dredge, but encompassed no review of the major internal parts of the dredge such as the engines and the pump(s), etc.[77]

Thereafter, following the submission of its bid on February 22, 1979, Weeks made a second visit to Marco Island in March, 1979 to once again inspect the Western Hunter.[78] This visit was made by Messrs. Rice and McPhillips, and company president Richard Weeks.[79] Said inspection resulted in a number of positive observations by Mr. McPhillips such as the following: that the dredge had been well maintained; heat had been kept on the motors and generators; the engines had been regularly rolled over to prevent freeze up; the dredge was extremely rugged; there was an especially wide, long hull, and a 73 foot ladder; and that the dredge could sweep the entire 300 foot channel of the Ten-Tom "without any problem at all." [80] The primary purpose of this second visit, however, according to Mr. Rice, "was to show the owner of Weeks Dredging ... the vessel; and [also] for Mr. McPhillips to see it." [81] Mr. Rice also noted that as of the second visit no electrical surveys had yet been performed.[82]

As a final and definitive method of inspection, Weeks hired an independent diesel engine expert, a Mr. Henry Wiggins, to inspect the dredge's engines.[83] With Messrs. Rice, Weeks, and McPhillips present, Mr. Wiggins scrutinized each of the four diesel engines and the Western Hunter's generator "very carefully" and immediately afterwards gave Messrs. Rice, Weeks, and McPhillips an oral report.[84] Later thereon, Mr. Wiggins submitted a written report dated March 21, 1979, which concluded that:

> It is the opinion of the undersigned that the [Venture engines and generator] should operate satisfactorily for an indefinite period with proper supervision, care and maintenance.[85]

Lastly, the Corps itself sought to inspect the Western Hunter *prior to Weeks purchasing it, and prior to the actual award of the contract* on April 2, 1979.[86] In this connection, after the bids were opened on February 22, 1979, a Corps employee, a Mr. Moore, contacted Weeks to inquire as to the specific dredge Weeks intended to use if awarded the Ten-Tom project.[87] Weeks responded thereto by telegram and letter, both dated March 22, 1979, with the dredge size, its name, and location, including six pages of detailed specifications.[88] Thereafter, at a meeting with Corps officials of the Mobile district, the Corps responded that the specifications "looked very good" and requested the opportunity to inspect the Western Hunter themselves.[89] It was Mr. Rice's understanding that this inspection was in order for the Corps to determine for itself whether the Western Hunter was suitable to perform the Ten-Tom contract.[90] Mr. Rice furnished the Corps with the precise location of the dredge and the name of a contact person, a Mr. John Abrams.[91] Several days later, Mr. Moore reported back that a Corps inspector from Tampa, Florida, had reviewed the Western Hunter and stated that "the dredge was all

---

76. Tr. 581–82.

77. Tr. at 582.

78. Tr. at 589.

79. Tr. at 590.

80. Tr. 107–08.

81. Tr. at 591.

82. Tr. at 591.

83. Tr. at 590–92.

84. Tr. at 112.

85. PX 3.

86. Tr. at 103.

87. Tr. 104.

88. DX 13.

89. Tr. at 104.

90. Tr. at 598.

91. Tr. at 597.

... [Weeks] had said it was, it was excellent and the award was on its way." [92]

As noted *supra*, Weeks later received notice that it had been awarded the contract on April 2, 1979.[93] Some 10 days thereafter, Weeks purchased the Western Hunter (renamed the Venture) at a reported price of $700,000.[94] Once purchased by Weeks, the Venture underwent what appears to have been major repairs and overhauling.[95] Work costing some $300,000 (43% of the purchase price) was performed on the dredge including replacing many parts and making various modifications to more closely conform the dredge to the unique demands of the Ten-Tom project.[96] According to the testimony of Weeks' employees Messrs. Rice and Harris, the Venture was in excellent condition to perform on the Ten-Tom project following this period of repairs.[97]

Weeks received its notice to proceed with the project work on June 7, 1979.[98] Shortly after that date, but prior to the actual commencement of dredging on January 19, 1980, the Corps undertook a final fathometer survey of the material to be dredged.[99] As noted *supra*, this survey indicated that there had been a very substantial reduction in the estimated maximum pay yardage from 7,789,200 CY to 6,557,518 CY (84.2%).[100] The reduction in materials (approximately 16%) to be dredged was attributed to severe flooding between the time of the Corps' original bid survey in 1972–73 and the 1979 survey noted *supra*.[101] This flooding generating the reduction in materials, plus the alleged greater than anticipated production capability of the reconditioned Venture, induced Weeks to recalculate its estimated number of gross dredge days.[102] As a result thereof, the number of estimated dredge days to complete the project was revised downward from 612 to 413 days, or to 13.76 months.[103] The initial Time Estimate was prepared on or about February 1, 1979, prior to the submission of its bid, whereas it should be noted that the revised estimate (PX 30) was not prepared until four years thereafter which was *early 1983, following* the filing of administrative claims herein.

The contract provided for *completion* of the project some *760* days after receipt of the notice to proceed.[104] Work was to begin no later than 20 days after receipt of the notice to proceed.[105] The notice to proceed was received by Weeks on June 7, 1979.[106] Survey work on the project began on June 8, 1979.[107]

Shortly thereafter, by a document dated July 10, 1979, Weeks submitted to the Corps a "Construction Progress Chart" detailing precisely how it planned to complete the project within the 760 days allotted.[108] In this progress chart, Weeks broke the project down into four phases according to time and cost to complete: (i) Mobilization and Demobilization; (ii) Clearing and Grubbing the disposal areas; (iii) Construction of Dikes and Weirs; and (iv) Excavation (dredging).[109] The "Estimated Cost" figures for each phase totalled to the contract price ($9,329,328.00), and were used by the Corps as a base to calculate Weeks'

**92.** Tr. at 105.

**93.** JS ¶ 39.

**94.** Tr. at 122, 1461–62.

**95.** Tr. 603–09.

**96.** *Id.*

**97.** Tr. at 608 (Rice), 366 (Harris).

**98.** JS ¶ 40.

**99.** JS ¶ 52.

**100.** *Id.*

**101.** JS ¶ 53.

**102.** Tr. at 837, 759–60, 845.

**103.** Tr. at 907–09; 413 days divided by 30 days per month = 13.76 months.

**104.** PX 1 at 1A–1 ¶ SP–5.

**105.** *See* n. 104, *supra*.

**106.** JS ¶ 40.

**107.** PX 62 at Report for June 7–11, 1979.

**108.** PX 31.

**109.** *Id.*

progress payments.[110] According to Weeks' progress chart, the project starting and completion dates were June 7, 1979 and July 6, 1981, respectively, aggregating a 760–day period, with actual dredging to begin on November 1, 1979, and to end on June 18, 1981 (or a total of 595 days to complete).[111]

Contrary to Weeks' July 10, 1979 estimate, mobilization was not completed until January of 1980, rather than November of 1979.[112] The actual dredging work, therefore, which was scheduled to begin on November 1, 1979, did not commence until January 19, 1980.[113] Not surprisingly, Weeks' completion date for the actual dredging was also significantly behind schedule. As noted *supra,* the *estimated* ending date for the actual dredging was June 18, 1981,[114] whereas Weeks did not complete the actual dredging until on or about April 16, 1982.[115] Demobilization, which was scheduled to end on July 6, 1981,[116] was also far behind schedule, although it is not clear from the evidence in the record when demobilization was, in fact, completed. The latest date in the record which reflects continuing demobilization is July 29, 1982, *i.e.,* the last daily dredge report.[117] Based on the *initial* starting date of June 7, 1979, *supra,* and the latest date of work indicated on the record, to wit, July 29, 1982, it appears that Weeks took well over the projected 760 days to complete the project.

Throughout the period of dredging, which actually lasted from January 19, 1980 to April 15, 1982, as well as through the later period of disengagement continuing at least through July 29, 1982, the events of each dredging work day were summarized by Weeks in a continuous log of reports called the "Daily Dredge Reports" (DDR).[118] These reports were periodically received and reviewed by Corps representatives at regular intervals.[119] Similarly, the Corps periodically summarized the observed performance of the contractor on its own reports styled "Quality Assurance Reports" or Corps "Inspector's Daily Construction Reports" (QAR).[120] These Corps' reports span the period June 7, 1979 to May 3, 1982.[121] The record contains approximately 908 DDRs, and some 1,050 QARs.

The DDRs and the Corps' QARs form the only *contemporaneous* business record of events *as they occurred* during the performance of the Ten-Tom contract. The DDRs, in particular, contain a daily log of the alleged actual gross cubic yards dredged, the type of materials dredged, and a record of delays in dredging due to equipment malfunction and other adverse dredging conditions, etc.[122] The record also reflects that the most significant part of this data, *i.e.,* that regarding the quantity and type of each material dredged daily on the project, was determined simply by the *visual* inspection of Weeks' employee(s) as the dredged materials were dispensed into, and lay in, the various disposal areas.[123]

Said dredging process consisted of the Venture cutting and hydraulically pumping various subsurface materials (*i.e.,* sands, clays, fines, eutaw, and gravel) from the river channel into prepared disposal areas. In order to visually estimate the amount of each of the materials dredged into the disposal areas, Mr. Rice testified that usually

110. Tr. at 858; PX 31.

111. PX 31.

112. *See* PX 62, Reports for November, 1979 through January, 1980; PX 34, Report for January 20, 1980.

113. PX 34, Report for January 20, 1980.

114. PX 31.

115. PX 34, Report for April 16, 1982.

116. PX 31.

117. PX 34, Report for July 30, 1982.

118. PX 34; Tr. at 867–68.

119. Tr. at 867, 882; PX 1 at 14.1 ¶ 56.

120. PX 62; Tr. at 2213–15.

121. PX 62.

122. PX 34.

123. Tr. 876–78.

once a day, "as part of the 8:00 a.m. round-up," he would first get a report from the dredge engineer coming off night duty, and then inspect the face of the current dredge cut, as well as any exposed river bank.[124] Thereafter, he would make his way to the current disposal site to view what he could of the materials that had been deposited there over the past 24 hours.[125] "[He] would go back and forth across the fill, inspecting, looking, seeing what material ... [was] there." [126] Mr. Rice further testified that he would sometimes dig into the materials with a shovel, and on other occasions he would order a bulldozer to remove the top layers to expose the materials below.[127] On the whole, however, he would simply *visually* estimate both the gross *amount* and the *composition* (by percent) of the various materials deposited into the particular disposal area over the past 24 hours. These estimates were then recorded on the daily dredge reports as the figures representing the gross amount of materials believed to have been actually dredged in any given day.

Even a cursory review of the DDRs and the corresponding Corps QARs reveals that Weeks encountered tremendous difficulties coping with repeated mechanical failures of the Venture as well as many unexpected physical conditions present in the river channel. For example, the record reflects that Weeks based its bid on a minimum estimated operating dredge time of 15.93 hours per day in order to complete the project within the 760 days allotted.[128] In reality, however, of the 818 days of actual dredging, Weeks was only able to achieve this rate in a little over half of those days (52.3%).[129] Factors contributing to Weeks'

failure to consistently achieve the predicted daily dredge time appear to have been largely mechanical. In some 44.1% of those days where dredging took place, Weeks encountered downtime due to equipment malfunction.[130] In this regard, it is important to note that while Weeks had set aside approximately eight hours a day for maintenance when calculating the 15.93 daily dredge time figure, a significant number of the mechanical failures Weeks experienced required downtime *over and above* the anticipated eight hours of daily downtime.

To a lesser extent, but still highly significant, were delays encountered due to unexpected conditions in the river channel. In particular, Weeks was forced to dredge through debris such as stumps and logs on numerous occasions. Plaintiff estimates some 7,000 individual stops due to stumps alone.[131] In addition, Weeks' records reference significant slowdowns in dredge productivity due to the presence of heavy gravel and layers of solid clay-like material called "eutaw" in the river channel. Of the 818 days of actual dredging, Weeks logged downtime due to such unexpected physical conditions in the river channel on approximately 20.2% of the days.[132] Lastly, various additional problems, such as maintaining an adequate crew during some winter months and finding personnel to perform certain types of repairs, were also sources of minor delays.

The parties do not disagree that on occasion Weeks did, in fact, encounter physical conditions in certain cut areas different than those depicted in the contract boring logs,[133] or that the Venture experienced

124. Tr. at 876.

125. Tr. at 876–77.

126. Tr. at 877.

127. *Id.*

128. PX 22; Tr. at 764.

129. PX 34 reflects 818 daily dredge reports, of which approximately only 428 show daily running time of 15.93 hours or better.

130. This figure does not refer to routine maintenance, such as moving of the dredge, changing

pontoons, or minor breakdowns such as changing cutter head teeth. *See* PX 34. This 44.1% figure reflects downtime on "repairs" specifically designated as such and requiring a minimum of one hour *each* to complete.

131. Tr. at 891.

132. *See* PX 34. This category includes delays due to logs, stumps, and high water.

133. Not necessarily *within* the maximum pay template, however.

mechanical problems in completing the dredging. However, as to the relative *significance* or *materiality* of these various conditions as causes of the plaintiff's delay, the parties remain far apart. Despite this opposition, the record does reflect many areas of acknowledgement of plaintiff's contentions, if not agreement, as to the nature of the conditions Weeks experienced on the job. Particularly probative in this regard are numerous remarks found in the Corps' own Inspector's Reports.[134] These reports reveal that as early as February, 1980 the Corps was well aware that Weeks was allegedly encountering unexpected amounts of eutaw in certain cut areas, and from November, 1980 Weeks was also allegedly experiencing heavier and larger sized gravel than expected in certain cut areas.[135] More importantly, however, defendant has specifically admitted, on the record, that Weeks encountered and dredged a greater quantity of eutaw than indicated by the contract boring logs.[136] Similarly, based on an internal Corps' document submitted by the plaintiff, defendant has also admitted that Weeks encountered both quantities and sizes of gravel greater than depicted in the contract boring logs.[137] However, as to both eutaw and gravel, the defendant's disagreement relates to the accuracy of plaintiff's reporting as well as its method of comparing anticipated pay template quantities with actual quantities dredged within and without the maximum pay template.

Relative to the stumps and logs encountered in the river channel, no controversy remains. This is so because, prior to initiating suit in this court, Weeks settled its stump and log claim with the Corps.[138] Said settlement arose out of a claim filed by Weeks with the Corps in October, 1982.[139] As a result of this claim, Weeks was granted contract modification no. DACW 01–79–C–0125–00011 dated June 26, 1984, consisting of an increase in the contract price in the amount of $2,881,047.63.[140] This modification reflected compensation for 174 additional dredge days due to the logs and stumps claim.[141] Included in the $2,881,047.63 equitable adjustment was $348,965.15 in interest on the plaintiff's claim running from July 6, 1983 to June 30, 1984.[142]

At the same time the stump and log claim was submitted to the Corps, Weeks also submitted a *separate* equitable adjustment claim covering two of the three differing site conditions at issue in the claim before this court.[143] This separate claim was for an equitable adjustment based on differing site conditions for an excess quantity of gravel and for oversize gravel.[144] As administratively filed, it sought a contract modification in the amount of $3,110,218.73 for a reported 204.9 days of excess dredging due to the two alleged gravel differing site conditions.[145] The parties engaged in extensive negotiations in an effort to resolve this claim, but to no

---

**134.** PX 62. These reports reflect the official observations of the Corps throughout the period of the contract.

**135.** *See* PX 62, Report nos. 243–49; 271–77; 329–30; 479–85; 519–23; 661–62; 686–92; 700–01; 714–15; 720–24; 738–42; 784–86; 794–96; 871–78; 886–93; 901–04; 908–16; 932–49; 953–60; 961–67; 968–75; 976–80.

**136.** Defendant has made a general admission with respect to the area of the pay template (*see infra* text at note 311), and a specific admission with respect to cut area 9 only in its pretrial submission, ¶ 83 at p. 22, and cut areas 19 in PX 68.

**137.** *See* PX 68; the admission of gravel appears to relate to Cedar Creek Cutoff; and that for oversize gravel to cut areas 14, 15, 18, and 19.

**138.** *See* DX 7.

**139.** *See* DX 20.

**140.** DX 7.

**141.** *Id.*

**142.** *Id.* While the merits of Weeks' stump and log claim is not before the court, Count II of plaintiff's petition, which is before this court, does seek additional interest on the stump and log claim running from October 29, 1982 through July 5, 1983.

**143.** *See* DX 20.

**144.** *Id.*

**145.** *Id.*

avail.[146] Thereafter, in September of 1983, Weeks submitted its administrative claim *in toto*, in a revised form, to the Corps.[147] This revised submission contained all three of the differing site conditions, *supra*, currently before this court.[148] Plaintiff's revised request for an equitable adjustment sought compensation for 157.8 additional dredge days based on the *three* differing site conditions alleged in its petition here.[149] The plaintiff's claim, as presented in the revised submission, was denied by the Corps in a letter dated August 30, 1984.[150]

Following notice of the contracting officer's August 30, 1984 decision denying plaintiff's claim, plaintiff filed suit in this court on December 26, 1984. Plaintiff's complaint states two separate counts. As noted *supra*, Count I relates to plaintiff's allegations that it incurred compensable delays of 215 days due to differing site conditions based on excess quantities and sizes of gravel and excess eutaw.[151] Count II, on the other hand, is a claim for statutory interest under the CDA arising out of Weeks' settlement of the stump and log claim noted *supra*. Weeks seeks additional interest payments that were denied by the Corps for the period October 29, 1982 through July 5, 1985, relative to the settlement amount, and on withheld liquidated damages from the date of their actual withholding through July 6, 1983. The complaint requests judgment, therefore, for said equitable adjustments in the aggregate amount of $3,941,647.70 plus interest,

as well as an undefined amount for the separate statutory interest claim.[152]

## III. *Contentions of the Parties*

### A. *Plaintiff's Contentions*

Plaintiff proffers exhaustive evidence in support of its contention that it has met the requisite burden of proof on each element of its three differing site condition claims. In terms of the requisite elements of proof, plaintiff points to five: (i) there must be affirmative representations in the contract documents describing the subsurface conditions where the differing site condition was allegedly encountered; (ii) the contractor must have acted as a reasonably prudent contractor in interpreting the contract documents; (iii) there must be evidence that the contractor reasonably relied on the contract documents; (iv) the actual subsurface conditions encountered on the job must have differed materially from those depicted in the contract documents; and (v) the differing site conditions actually encountered must have been reasonably unforeseeable.[153]

Consistently therewith, plaintiff avers that "[i]ndisputably, the Corps included representations and depictions of the composition of subsurface conditions in the contract documents."[154] In that connection, plaintiff relies on the IFB, as amended, which included some 156 boring logs. According to the plaintiff, "[t]he boring logs ... contained [a] myriad [of] descrip-

---

**146.** *See* DXs 2, 3, 4, 5, 8, 9.

**147.** DX 6.

**148.** DX 6. This revised submission, coming before the settlement of the stump and log claim, also contains reference to the delay due to stumps and logs.

**149.** DX 20.

**150.** Plaintiff's Complaint ¶ 17; Defendant's Answer ¶ 17.

**151.** This 215-day figure was subsequently revised downward to 195 days at trial and in the plaintiff's post-trial submission and proposed findings of fact.

**152.** Following the trial, plaintiff revised its ad damnum relative to the equitable adjustment to

$3,599,171.72. For additional details relative to the trial, *see Weeks Dredging & Contracting, Inc.,* 11 Cl.Ct. 37 (1986).

**153.** Plaintiff's Post-Trial Submission (PPS) at 119, *citing Dunbar & Sullivan Dredging Co.,* ENG BCA 3165, 73–2 BCA ¶ 10,285 (1973); *P.J. Maffei Building Wrecking Corp. v. United States,* 732 F.2d 913, 917 (Fed.Cir.1984); *Morrison-Knudsen Co. v. United States,* 345 F.2d 535, 539 (Ct.Cl.1965); *Foster Construction C.A. of Williams Brothers Co. v. United States,* 435 F.2d 873, 893 (Ct.Cl.1970); *Farnsworth & Chambers Co. v. United States,* 346 F.2d 577, 580–81 (Ct.Cl. 1965).

**154.** PPS at 120.

tive phrases of the subsurface materials sampled."[155] These descriptive phrases, says plaintiff, in turn, did correlate, and were intended by the Corps to be correlated, with the USCS.[156] In the contract documents, these statements therefore, did, according to the plaintiff's reading of the applicable case law, rise to the level of "clear and direct representations of subsurface conditions that a contractor could reasonably expect to encounter" relative to quantity of each depicted material.[157]

Next, plaintiff argues that as to the reasonableness of its interpretation of the representations in the contract documents, this court must judge its (plaintiff's) conduct by "plac[ing] itself 'into the shoes of a reasonable and prudent contractor' and decide how such a contractor would act in [Weeks'] ... situation."[158] In this regard, says plaintiff, "the contractor need not show that its interpretation of the Contract documents is necessarily the best one, but merely a reasonable one."[159] In furtherance of the foregoing, plaintiff allegedly relied on the representations contained in the contract documents to aid in making two interrelated estimations. First, plaintiff needed to estimate the *quantity* of each of the materials, *in situ*, to be dredged within the maximum pay template. Second, plaintiff needed to forecast a dredge time estimate for the entire project, based on the materials anticipated, in order to price its bid.

In carrying its burden relative to the reasonableness of its bid preparation, plaintiff points first to the 20 years of bid experience of Weeks' bid estimator, Mr. Rice.[160] Also, in determining the materials estimates, plaintiff contends that Mr. Rice "thoroughly and completely analyz[ed] every pertinent Contract document and all the boring logs in the IFB."[161] Mr. Rice relied, says plaintiff, as suggested in the IFB, on the USCS and appropriately identified, grouped, and quantified the materials indicated on the contract boring logs.[162] Based on the foregoing technique, the reasonableness of which plaintiff claims is uncontroverted due to the failure by defendant to have called a dredging bid expert, Weeks determined its estimated subsurface materials to consist of 90% sands and clay, 8.1% gravel, and, the balance, 62,350 cubic yards of eutaw.[163] In addition, based on the same evidence, Mr. Rice interpreted the contract boring logs to represent gravel with an average maximum size of ¾ of an inch with isolated pockets of gravel up to 1½ inches.[164]

As for the alleged reasonableness of Weeks' time estimate in which to perform the contract work, plaintiff argues that it "properly accounted for all the factors which affect dredge productivity...."[165] Plaintiff contends that the evidence shows it took into account "downtime for dredge repairs and maintenance, non-pay dredging, the dredge's advance speed, dredge capaci-

**155.** *Id.*

**156.** *Id.*

**157.** PPS at 121 *citing Fox v. United States*, 7 Cl.Ct. 60, 65 (1984); *Foster Construction*, 435 F.2d at 888, *citing United Contractors v. United States*, 368 F.2d 585, 598, 177 Ct.Cl. 151 (Ct.Cl. 1966). Plaintiff posits alternatively that the contract boring logs could be similarly interpreted as statements of general conditions, *Rottau Electric Co.*, ASBCA No. 20283, 76–2 BCA ¶ 12.001 (1976), or that the requisite representations of subsurface conditions could be found by implication in the contract documents taken as a whole, *Stock & Grove, Inc. v. United States*, 493 F.2d 629, 645, 204 Ct.Cl. 103 (Ct.Cl.1974).

**158.** PPS at 128 *quoting Maffei Building Wrecking Corp.*, 732 F.2d at 917, *quoting H.N. Bailey*

*Associates v. United States*, 449 F.2d 387, 390, 196 Ct.Cl. 156 (Ct.Cl.1971).

**159.** *Id.*

**160.** PPS at 122.

**161.** PPS at 122. The court notes, however, that Mr. Rice candidly admitted that he did not consider *all* of the boring logs in arriving at his estimate. He stated that some 15 plus or minus logs were *not* used. Tr. at 673, 1174.

**162.** PPS at 122–23.

**163.** *Id.* at 123.

**164.** PPS at 124.

**165.** *Id.*

ty, the length of the discharge line, and the lift." [166]  Weeks also based its time estimate for dredge productivity on what it styled as historical data for a typical 24-inch dredge.[167]  On this basis, they say, Weeks reasonably estimated that "it could complete the dredging in 9,607 dredge hours, or 600 dredge days." [168]

To buttress its contention that its bid estimate was a reasonable interpretation of the contract documents, Weeks offers the corroborating testimony of its two expert witnesses Robert Kondner (qualified as a geotechnical expert [169]) and Thomas Turner (qualified as a dredge expert), as well as the Corps' internal materials breakdown and time estimate for the completion of the project.  Dr. Kondner, who was retained by the *Corps* in another matter arising out of the Ten-Tom project, testified that by his analysis of the contract documents, Weeks should have anticipated dredging 5.19% gravel, and only 24,121 cubic yards of eutaw.[170]  Both amounts are significantly *less* than those initially estimated by the plaintiff (*i.e.*, 8.1% and 62,350 cy, respectively).  Similarly, and not surprisingly, Mr. Turner's analysis of the contract boring logs yielded a figure of 5.12% of anticipated gravel, again significantly less than plaintiff's initial estimate.[171]  With regard to the foregoing, Mr. Turner also heaped considerable praise on Mr. Rice's bid estimation technique and, in particular, his use of historical data in arriving at Weeks' dredge productivity rates.[172]  Plaintiff ascribes substantial credence to Mr. Turner's testi-

mony calling him "[p]erhaps the preeminent expert in hydraulic dredging in the United States," and one who even the "defendant attempted to retain ... as its expert dredge witness in the subject case." [173]

As for Weeks' attempt to rely on the Corps' internal materials breakdown and time estimate for completion of the project, plaintiff claims that these estimates are particularly relevant because they are markedly similar to those of Weeks.[174]  For example, embracing assumptions similar to those used by Weeks, the Corps projected 18.06 months to complete the work, whereas plaintiff estimated a more conservative 20.4 months to complete the work.[175]  In addition, the Corps' estimate predicted 8% gravel, in contrast to the similarly more conservative figure of plaintiff (8.1%).[176]  Lastly, plaintiff points to the fact that the Corps' estimate was done using generally the same type of dredge picked by the plaintiff, *i.e.*, a 24-inch hydraulic dredge.[177]  Collectively, these factors, argues plaintiff, all tend to confirm the reasonableness of Weeks' own bid estimate.[178]

The third element of plaintiff's differing site condition claims is that of reasonable reliance upon the contract documents.  According to plaintiff, "Weeks easily meets this third element because its Bid Estimate is derived almost entirely from the subsurface data contained in the Contract documents." [179]  Furthermore, such reliance was clearly reasonable for this project because "the case law ... recognizes the contractor's right to rely upon the Govern-

---

**166.** PPS at 124.

**167.** PPS at 125.

**168.** PPS at 125.  Weeks adds that: "Because the total quantities of materials were substantially reduced by flooding, and the Venture had a greater productivity than the typical 24 inch dredge assumed in the Bid Estimate, Weeks could have finished the dredge work in 413 days—provided the subsurface conditions were as represented in the Contract." *Id.* at n. 60.

**169.** *See* Dr. Kondner's background and proffer, Tr. at 1517–31.

**170.** PPS at 126.

**171.** *Id.*

**172.** PPS at 126–27.

**173.** *Id.* at 126.

**174.** Tr. at 836.

**175.** Tr. at 836.

**176.** PPS at 127.

**177.** *Id.*

**178.** PPS at 127.

**179.** *Id.* at 130.

ment's boring log data."[180]  In fact, it argues, such " 'reliance is affirmatively desired by the Government, for if bidders feel they cannot rely [on borings], they will revert to the practice of increasing their bids.' "[181]

Weeks' next point addresses the relative materiality of the differing subsurface conditions it *actually* encountered as compared with subsurface conditions *depicted* in the contract documents.  Here, Weeks argues that "[w]hat constitutes a 'material difference' depends on the particular facts of each case, but a comparison of Weeks' Bid Estimate for quantities of gravel and Eutaw and oversize gravel with the actual subsurface conditions clearly establishes a 'material difference.' "[182]  Weeks' definitive evidence of the subsurface conditions *actually* encountered consists primarily of the daily dredge reports noted *supra.*  The method of estimating and recording the actual (gross) materials dredged into the disposal areas, says plaintiff, was "completely consistent with the industry standard, and Mr. Rice could estimate the materials as well as anyone."[183]  According to Weeks, those "[d]aily reports prepared by the contractor and contemporaneously submitted to the Government are the most relevant, credible, and probative evidence of what actually transpired during contract performance."[184]  Thus, concludes plaintiff, these reports show that Weeks actually encountered 24.9% gravel (gross, *i.e.*, within and without the maximum pay template), as opposed to the initial estimate of 8.1% (within the maximum pay template only); 161,305 cubic yards of eutaw (gross, *supra*), as opposed to the estimated amount of 62,350 cy; and graded gravel up to three inches in size, as opposed to the estimated three-fourths of an inch—all ma-

teriality different than depicted in the contract documents.[185]

Plaintiff approaches the "materiality" issue from another perspective as well. Quoting *Foster Construction*, plaintiff further argues that a differing site condition is also material where " 'plainly substantial modifications of the work' " are needed " 'to meet [the] changed conditions.' "[186] Such was the case on the Ten-Tom project, it argues, where a substantial modification of the work was required when, as a result of the differing site conditions, Weeks' dredge productivity was severely curtailed and both the time and cost of performance were dramatically increased.[187]  Weeks avers that its dredge productivity was hampered due to the excess gravel, eutaw, and oversize gravel because "larger particles are more difficult to suspend in hydraulic transport and thus more difficult to pump through a discharge line."[188]  Moreover, plaintiff says that inasmuch as "[e]ven the smallest quantities of gravel hurt production ... an increase from 8.1% gravel to 24.9% gravel is extremely significant and changed the entire nature of the project."[189]  The same holds true, adds plaintiff, even more so relative to the excess eutaw and oversize gravel which the evidence suggests are even more difficult to pump.

Plaintiff also contends that it has offered into the record several expressed admissions by the defendant of the alleged differing site conditions.  These alleged admissions are said to extend to oversize gravel in Cut Areas 14, 15, 18, 19, 20 and 21; excess quantities of eutaw in general and specifically in Cut Areas 9 and 19; and

---

**180.** PPS at 131 *citing Fox v. United States,* 7 Cl.Ct. at 65; *Foster Construction,* 435 F.2d at 888; *United Contractors,* 368 F.2d at 598.

**181.** *Id.* at 131–32 *quoting Foster Construction,* 435 F.2d at 887.

**182.** PPS at 132.

**183.** *Id.* at 133.

**184.** PPS at 133.

**185.** *Id.* at 133–34.

**186.** PPS at 137, quoting *Foster Construction,* 435 F.2d at 893.

**187.** PPS at 134.

**188.** *Id.*

**189.** PPS at 134.

excess gravel quantities in Cedar Creek Cutoff and other cut-offs.[190]

Weeks measures the materiality of the lost dredge productivity allegedly occasioned by both the proven and admitted differing site conditions by pointing to the excess days said circumstance required to complete work on the project. According to plaintiff, "[w]hile Weeks reasonably expected it could dredge the job in 413 days, it was actually on the job for 818 days." [191] Adjusting this figure further by subtracting 36 days for a flooding extension, and 174 days due to the previously settled stump claim, "leaves 195 additional dredge days which are due solely to the excess quantities of gravel and Eutaw and oversize gravel." [192] Weeks attempts to corroborate the foregoing 195 day figure by citing to an analogous delay estimate of 194 days made by its expert witness Thomas Turner.[193]

In addition, with regard to the materiality issue, Weeks also presents an exhaustive review of how the applicable case law supports its method of measuring the materiality of the encountered differing site conditions. Plaintiff, however, relies primarily on cases dealing with differing site conditions brought before the Corp of Engineers Board of Contract Appeals.[194] In particular, plaintiff discusses the similarity of the facts of the case at bar with the facts in three cases where differing site conditions were found. In the case of *Bernard McMenamy Contractor, Inc.*, 77–1 BCA at ¶ 12,335 (1976), a dredge contractor came to the conclusion upon studying government supplied boring logs that the materials to be dredged were basically sand with some gravel.[195] The actual conditions, however, as recorded on the contractor's daily reports, and accepted by the Board, differed materially in that there were significant amounts of cobbles and boulders which severely impacted productivity. The daily reports were completed using an "eye balling" technique quite similar to that used by Weeks. Although noting that "it was difficult to quantify the amount of larger particles of rock, the Board held that the repeated references in the daily reports substantiated the allegation that material larger than expected 'was present in varying but substantial amounts.' " [196]

Similarly, in *American Structures, Inc. & Mining Equipment Manufacturing Corp., A Joint Venture*, ENG BCA 3410, 76–1 BCA ¶ 11,683 (1975), government boring logs indicated the presence of scattered cobbles and boulders. Upon encountering a substantial amount of cobbles and boulders, the contractor sought and was awarded an equitable adjustment when the "Corp Board held that the increased quantities of cobbles and boulders constituted a physical condition differing materially from that indicated by the contract documents." [197] Likewise, argues plaintiff, in *Tecon Corp.*, ENG BCA 2782, 75–1 BCA ¶ 11,282 (1975), "the Corp found a differing site condition where a contractor, while dredging two rock shoals in Lake Erie, drilled or probed an area of approximately 849,616 square feet, rather that (sic) the anticipated area of 796,650 square feet based on contract drawings and dredged" an approximately 53.1% greater amount of rock than anticipated.[198] Our response to plaintiff's cited cases is simply that subject litigation is a highly factual and circumstantial case; that the cited cases are significantly distinguishable from the case at bar; moreover, we are not compelled to follow Board decisions.

---

190. PPS at 135–36.

191. *Id.* at 136.

192. PPS at 136.

193. *Id.* at 137.

194. *Granite-Groves, A Joint Venture,* ENG BCA Nos. 3977, 4033, 79–2 BCA ¶ 14,078 (1979); *Jackson-Swindell-Dressler, A Joint Venture,* ENG BCA No. 3614, 76–2 BCA ¶ 12,222 (1976); *Clem-*

*ent Brothers Co.,* ENG BCA No. 2969, 70–2 BCA ¶ 8438 (1970); and *Morrison-Knudsen Co.,* ENG BCA No. 3856, 3857, 79–1 BCA ¶ 13,798 (1979).

195. PPS at 138.

196. *Id.* at 139, *quoting Bernard McMenamy,* 77–1 BCA at 59,635.

197. PPS at 139.

198. *Id.* at 139–40.

Lastly, as to its fifth and final element,—that of whether the encountered differing subsurface conditions were unforeseeable—plaintiff argues that "[t]here are only two ways a contractor can be held to have foreseen a differing site condition." [199] The first is proof the contractor had actual knowledge which it ignored; the second is where an *inadequate* pre-bid site investigation failed to reveal subsurface conditions an otherwise adequate investigation would have revealed. [200] On both counts, plaintiff argues that there is no evidence in the record to suggest the foreseeability of any of the differing site conditions alleged. As for its pre-bid site investigation, plaintiff contends that it undertook an examination which was fully consistent with what a reasonable and prudent contractor would have done under the circumstances. [201] Plaintiff argues alternatively that, "even assuming ... *arguendo* that Weeks investigation was inadequate, the Defendant has completely failed to adduce any evidence that a more exhaustive site investigation would have revealed some observable conditions that contradicted the Contract documents." [202]

In addressing its second cause of action, plaintiff argues that it submitted to its contracting officer the differing site condition claims alleged in its petition here, including the previously settled stump claim, on October 6 and 29, 1982. [203] On the same dates, Weeks submitted a government DD Form 633 as its basis for complying with the certification requirement of the CDA. [204] The government processed the claims from that date without ever requesting additional certification. [205] On July 6, 1983, Weeks formally certified its claims using the precise language of the CDA. [206] Against this background, plaintiff claims that it properly certified its claims in October, 1982 and, therefore, interest should be calculated on any and all of its claims, including the settled stump claim, from the date of submission of its DD Form 633. [207]

### B. *Defendant's Contentions*

The defendant's theory of the case, as expected, differs substantially from that advanced by the plaintiff in its contentions. That is to say, defendant focuses succinctly on several fundamental weaknesses in Weeks' proof, and attempts to explain Weeks' extensive delay, in completing the project, as being due to factors other than differing site conditions. Thus, in stark contrast to the expansive contentions of the plaintiff, the government argues quite pointedly that:

> The evidence presented by Weeks ... presents an *invalid comparison of two different sites* for which no compensation should be given.... The *first* site ... is the "pay template" upon which Weeks based its analysis of the soils it

**199.** PPS at 141.

**200.** *Id.*

**201.** PPS at 141. Again, relying on *Bernard McMenamy Contractors, Inc.*, plaintiff adds that in this regard "the Corps' Board of Contract Appeals has specifically cautioned against using an overly expansive application of pre-bid site investigation requirement to undermine the Differing Site Conditions Clause." PPS at 144.

**202.** PPS at 144. Plaintiff argues further that the government's "failure to present any such contradicting evidence completely and wholly refutes their defense that Weeks' pre-bid site investigation was inadequate." Here plaintiff cites *Alps Construction Corp.*, ASBCA No. 16966, 73–2 BCA ¶ 10,309 (1973); *John G. Vann v. United States*, 420 F.2d 968, 190 Ct.Cl. 546 (Ct.Cl. 1970); *Bernard McMenamy Contractor, Inc.*, 77–1 BCA at 59,635. Plaintiff also presents a review of the evidence relative to the proper measure of damages. However, inasmuch as we find no differing site condition liability on behalf of the defendant, because of failure of proof on behalf of plaintiff, we do not address plaintiff's contentions as to the alleged amount of damages.

**203.** PPS at 149.

**204.** *Id.*

**205.** PPS at 149.

**206.** *Id.*

**207.** PPS at 149–50. We address the question of certification relative to the calculation of statutory interest *only* as it relates to the previously settled stump claim. Outside of that context, because plaintiff has failed to prove liability as to the other alleged differing site condition claims, the interest issue is clearly moot.

expected to encounter.... The *second site is the area of Weeks' actual excavation ... which extended beyond the pay template.* [T]he effect of Weeks' *overdredging beyond* the pay template caused it to encounter a greater percentage of gravel and Eutaw than was indicated by the contract boring logs as being within the pay template. Week's [sic] lawsuit is thus nothing more than an attempt to obtain additional compensation for its overdredging activities ... (emphasis added).[208]

While defendant contends that this fundamental failure of proof causes the plaintiff's case to be fatally flawed, it also addresses the sufficiency of the evidence as to the other elements of plaintiff's differing site condition claims which it also contends to be defective.

First, defendant focuses on plaintiff's oversize gravel claim. Defendant claims that the evidence shows that the amounts of any larger than anticipated gravel encountered on the project were far from material.[209] According to defendant, Weeks admitted that the boring logs showed gravel up to 1½ inches with "minute" amounts of two and three inch gravel.[210] At trial, defendant avers that it presented unrebutted evidence that Weeks actually encountered "only .04 percent of two-inch gravel, .76 percent of one and one-half inch gravel, 2.13 percent one-inch gravel, and 5.15 percent of three-quarter-inch gravel."[211] Any isolated comments in the plaintiff's daily dredge reports noting well-graded gravel up to two and one-half inches were *not* corroborated by an appropriate sieve analysis, as are the estimates of the defendant, but were frequent and easily mistaken visual estimates of gravel size.[212]

In addition, defendant points out that "Weeks' [proof] was completely lacking in probative evidence to establish the amount of delay attributable to the supposed 'oversized' gravel it allegedly encountered."[213] No witness was offered to attest to the number of delay days due to oversize gravel, and plaintiff's witness, Mr. Rice, admitted that "he was unable to provide a number of days for this aspect of Week's [sic] delay claim and that no exhibit had been prepared reflecting such a delay."[214] Again, defendant concludes, plaintiff has failed in its proof as to the oversize gravel claim.

As for Weeks' excess eutaw claim, defendant again attacks the materiality of plaintiff's figures for eutaw actually encountered versus eutaw expected based on the contract boring logs. Defendant first notes that simply by comparison—.95 percent expected eutaw versus 2.5 percent allegedly encountered—the difference is immaterial.[215] Moreover, given the naturally variable occurrence of eutaw, the several admitted omissions of expected eutaw in plaintiff's bid calculation, as well as Weeks' substantial overdredging, even this insignificant difference between the anticipated and encountered estimates of eutaw is easily explained.[216]

Defendant similarly contends that plaintiff's failure to take into account overdredging of eutaw in preparing its bid estimate also reflects Weeks' failure to act as a reasonable and prudent dredge contractor under the circumstances. " '[A] reasonable, prudent contractor and bidder in these circumstances would not have assumed that no [Eutaw] would be encountered' [during overdredging] , ... knowing where the Eutaw was to be found on this project and anticipating that the project

---

**208.** Defendant's Post-Trial Brief (DPB) at 3–4.

**209.** DPB at 9.

**210.** *Id.*

**211.** DPB at 9.

**212.** *Id.* at 10. Defendant argues that "[f]urthermore, as Mr. Rice aptly pointed out, a three-quarter-inch piece of gravel could easily be mis-

taken for a two-inch piece by someone attempting visually to estimate its size without the aid of sieve analysis." *Id.*

**213.** DPB at 10.

**214.** *Id.*

**215.** DPB at 11–12.

**216.** *Id.* at 12–14.

would be overdredged by 20 to 25 percent."[217] Lastly, as with the oversize gravel claim, defendant contends that plaintiff has presented no evidence connecting the alleged excess eutaw with a specific period of delay.[218] In fact, emphasizes defendant, the evidence shows that when dredging eutaw, Weeks actually proceeded at a pace many times quicker than anticipated in its bid estimate.[219]

Turning to Weeks' last alleged differing site condition, that for excess gravel, defendant relies primarily on the argument that it is Weeks' total failure to separate the *encountered* overdredged gravel from the *encountered* gravel *within* the pay template that accounts for Weeks' daily dredge reports showing *excess* gravel.[220] Also, according to defendant, "[a] proper comparison establishes that the amount of gravel actually excavated on this project did not differ materially from the amount that Weeks reasonably should have anticipated dredging."[221] Relying on its own post-dredge test-pit study of the excavated materials, defendant contends that plaintiff actually dredged approximately 16 percent gravel *by weight* in cut areas where it asserted the greatest percentage variations, whereas when taking into account estimated gravel from anticipated overdredging, a reasonable and prudent contractor would have expected a range for gravel of 7.4 to 14.3 percent by weight based on the boring logs.[222] Based on this comparison, defendant concludes that there were only minor or immaterial differences between what plaintiff actually encountered and what a reasonably prudent contractor would have estimated based on the contract boring logs.

Moreover, claims defendant, even this relatively minor difference in encountered and anticipated percentages of gravel is readily explainable by a number of factors other than the alleged differing site condition. First, the Corps' test pit study more likely *overestimates* the amount of *actual* gravel dredged because it is based on a sample of *only* those five disposal areas where "Weeks claimed the greatest difference existed between gravel percentages expected and those allegedly encountered."[223] Second, there was a significant amount of flooding on the Ten-Tom River prior to the dredging work, but subsequent to bid preparation, which took with it approximately 15.8% of the pay yardage to be dredged. Plaintiff claims this flooding washed away mostly finer silts and clays, which as a result would have required an upward adjustment of the relative proportion of *anticipated* gravel—an adjustment neither the Corps' nor Weeks' estimates take into account.[224]

Third, there is the method of visual ("eyeball") estimation Weeks used to approximate, on its daily dredge reports, the amount of each of the materials allegedly excavated on each given day.[225] Defendant claims that this method, as even conceded by the plaintiff, is less accurate than the Corps' sieve analysis, and should not, therefore, "be given any weight...."[226] This is because, defendant argues, of the manner in which the materials are dispensed from the pipeline; the consistently submerged disposal areas; as well as Weeks' crew's "lack of any prior experience or training in visually classifying materials, ... [all] underscore[ ] the unreliability of Weeks' reported amounts of gravel."[227]

217. DPB at 14 *quoting Fox v. United States,* 7 Cl.Ct. 60, 65 (1984).

218. DPB at 14–16.

219. *Id.* at 14.

220. DPB at 16–17.

221. DPB at 17.

222. *Id.*

223. DPB at 17–18.

224. *Id.* at 18–20. Defendant, in its brief, argues that had Weeks made this adjustment, Weeks' percentage of anticipated gravel would have been 10.4 percent. *Id.* at 19–20.

225. DPB at 21–22.

226. *Id.*

227. DPB at 21–22.

Lastly, there is what the government has termed the "weight versus volume" factor.[228] Here the government argues that its calculations of the percentage of dredged gravel were on a *weight basis* as opposed to plaintiff's which were on a *volume basis*.[229] Thus, defendant argues, citing the testimony of Mr. Rice, that "the percent by weight is going to be less than the percent by volume" and thus needs to be adjusted to match those calculations by volume.[230] "When the Corps [sic] final test pit estimate of gravel is adjusted in order to convert the percentage from weight to volume, the adjusted amount is approximately 11 percent."[231] This, concludes defendant, compared to the plaintiff's properly adjusted bid estimate of 10.4 percent,[232] emphatically reflects how illusory the alleged gravel differing site condition truly is.[233]

Similarly, with regard to the differing site condition for excess gravel, defendant also attacks the plaintiff's failure to present evidence which adequately apportions any of the alleged delay directly to the encountered and perceived excess gravel.[234] According to defendant, "[t]he lack of any material difference in the percentages of gravel reasonably anticipated and encountered is buttressed by a comparison of the amount of time that Weeks estimated it would need for the job and the actual time spent on the job, taking into account the equipment used."[235] The government premises this argument on plaintiff's *original* time estimate for completing excavation of the project, *i.e.,* 592 days.[236] Subtracting from this 592 figure 174 days for the stump claim and 38 days for flooding and a clearing and grubbing problem, "there are only 12 days for which Weeks has not been compensated out of the 818 days that Weeks engaged in dredging."[237]

Focusing on these 12 "uncompensated" days as a worst case circumstance from its posture, the government postulates a number of scenarios, none of which include excess gravel, which it believes easily explains this minimal period of delay. First is the plaintiff's admitted overdredging. Defendant *contends* that the evidence shows the plaintiff's overdredging accounts for "34 extra days that Weeks spent on this project for reasons unrelated to the materials Weeks encountered."[238] Second, Weeks' actual dredge productivity was, in fact, far below what it predicted and relied on in forecasting the 592 dredge days.[239] For example, Weeks predicted a 2,875 horsepower pump, but realized, on the average, only 2,035 pump horsepower.[240] Similarly, the anticipated pump rate for clay was 1,000 cy per hour, whereas Weeks achieved no higher than 333 cy per hour. Lastly, the pump rates for sand, sand with some to little gravel, and gravel with little sand were anticipated to be 1,500, 1,250, and 750, respectively, whereas "Weeks was able to achieve only fractions of those rates."[241] On these facts, defendant concludes, "[n]o amount of gravel can explain why the VENTURE was unable to achieve even modestly respectable production rates

228. *Id.* at 22.

229. DPB at 22.

230. *Id.*

231. DPB at 22.

232. *See supra* note 206.

233. DPB at 22–23.

234. *Id.* at 23–27.

235. DPB at 23.

236. *Id.* In support of the 592 day figure, the government argues that "[t]his estimate was prepared [July 10, 1979] *after* Weeks had purchased the VENTURE and presumably was aware of

the VENTURE'S capacity." DPB at 23. In addition, defendant argues that it is a more credible estimate because it was not prepared by Weeks in support of its claim, as was the revised 413 day figure calculated in June or July of 1983, long after the project was completed and Weeks' differing site condition claims had arisen. *Id.* at 23–24.

237. DPB at 24.

238. *Id.*

239. DPB at 24–26.

240. DPB at 25.

241. *Id.* at 26.

in sand and clay. It is clear, therefore, that the VENTURE had more to do with Week's (sic) woes on this job than did any material or supposed change in material." [242]

The government relies on the same extenuating circumstances noted *supra* to discredit the plaintiff's overall proof using another theory as well. Thus, the defendant contends that "[t]he general rule is that '[w]here both parties contribute to the delay neither can recover damage[s].' This general rule relating to concurrent delays is applicable 'unless there is in the proof a clear apportionment of the delay and expense attributable to each party.'" [243] In this regard, contends defendant, "[n]ot only has Weeks failed to segregate the delay relating to its overdredging, lowered production rates, or problems with the VENTURE, but it also failed to segregate the delays relating to each of the three alleged differing site conditions." [244] As a result, defendant concludes, plaintiff's case is hopelessly flawed for failing to present a basis for the court to calculate the amount of delay due solely to any one individual differing site condition it may find.[245]

Relative to count II of plaintiff's petition requesting additional interest on the previously settled stump claim, defendant argues that plaintiff's reliance on its DD Form 633 to fulfill the CDA certification requirement has been specifically rejected by the Federal Circuit in the case of *ReCon Paving, Inc. v. United States*, 745 F.2d 34, 40 (Fed.Cir.1984).[246] In addition, federal regulations prohibit the government from paying any additional interest on settled claims unless that interest is itself included as part of the settlement agreement.[247] Moreover, "to the extent a contractor seeks additional interest on a claim that has been settled by the contracting officer and which

is subject to a bilateral modification, that claim is barred by estoppel and accord and satisfaction in that compromise settlements are valid and binding upon both parties." [248]

## IV. *Discussion*

### A. *Introduction*

At the outset we noted, and now re-emphasize, that while this is a Type I differing site condition case, it is *not*, in major part, one which seeks an equitable adjustment because the subsurface materials actually encountered differed materially in *character* and *nature* from the subsurface materials depicted in the contract documents. Here, plaintiff contests the *nature* of the subsurface materials only as to the minor extent it allegedly encountered gravel larger in size than that depicted in the contract documents. However, the major focus of this case is the plaintiff's averment that it is entitled to an equitable adjustment because some of the subsurface materials actually encountered (*i.e.*, gravel and eutaw) materially exceeded those same materials as to the *quantity* depicted in the contract documents. It is to the plaintiff's allegations of *excess quantity* encountered that we are constrained to devote our primary attention.

A "Type I" differing site condition is appropriately styled inasmuch as it derives from the language contained in the first subpart of the standard "Differing Site Conditions (1968 FEB)" clause, which provides in relevant part as follows:

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) *subsurface or latent physical conditions at the site differing materially from those indicated in the con-*

---

**242.** DPB at 26.

**243.** *Id.* at 28 (citation omitted), *quoting William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed.Cir.1984).

**244.** DPB at 29.

**245.** *Id.* Defendant also addresses Weeks' damages calculation in its post-trial contentions. However, as with the plaintiff's contentions regarding damages, inasmuch as we find no liabil-

ity on behalf of the government, we do not address them.

**246.** DPB at 31.

**247.** *Id.* at 32 *citing* Federal Acquisition Regulation 49.112–2(d).

**248.** DPB at 32.

*tract....* The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase ... in the Contractor's costs ... an equitable adjustment shall be made and the contract modified in writing accordingly. (emphasis added).[249]

Such a clause appears in plaintiff's contract as General Provision 4.[250]

■ As to the meaning of the foregoing, it is now clear beyond cavil that the interpretation of contractual provisions, such as the differing site conditions clause quoted *supra,* is a question of law to be decided by the court independently of the evidence presented by, or the arguments of, the parties. *Bonner v. MSPB,* 781 F.2d 202, 205 (Fed.Cir.1986); *W.M. ·Scholosser Co., Inc. v. United States,* 767 F.2d 870, 873 (Fed.Cir.1985); *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913 (Fed. Cir.1984); *Foster Construction C.A. & Williams Bros. Co. v. United States,* 435 F.2d 873, 880 (Ct.Cl.1970); *Mojave Enterprises v. United States,* 3 Cl.Ct. 353, 357 (1983). Thus, this court and the Federal Circuit, as well as our predecessor, the Court of Claims, have, over time, given substance and legal meaning to this provision in the form of certain fundamental elements which must be proven, by the requisite quantum of proof, in order for a contractor to prevail on a differing site condition claim. For the most part, those fundamental elements are factual in nature, and therefore are the sole burden of

the plaintiff to prove by a preponderance of the evidence.[251]

■ Our reading of relevant and binding case law leads us to the conclusion that, in order for the plaintiff to persuade this court to award it the equitable adjustment it seeks,[252] six indispensable elements (one more than the five posited by the plaintiff [253]) *must* be established for each claim: (i) the contract documents must have affirmatively indicated or represented the subsurface conditions which form the basis of the plaintiff's claim; (ii) the contractor must have acted as a reasonably prudent contractor in interpreting the contract documents; (iii) the contractor must have *reasonably* relied on the indications of subsurface conditions in the contract; (iv) the subsurface conditions actually encountered, within the contract site area, must have differed *materially* from the subsurface conditions indicated in the same contract area; (v) the actual subsurface conditions encountered must have been reasonably unforeseeable; and (vi) the contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions *within the contract site. P.J. Maffei,* 732 F.2d at 916; *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984); *Arundel Corp. v. United States,* 515 F.2d 1116, 1128, 207 Ct.Cl. 84 (Ct.Cl.1975); *Foster Construction,* 435 F.2d at 87ε, 880; *United Contractors v. United States,* 368 F.2d 585, 594, 177 Ct.Cl. 151 (Ct.Cl.1966); *Stuyvesant Dredging Co. v. United*

---

**249.** PX 1 at General Provisions p. 1. Defendant has previously admitted timely notice. *See Weeks Dredging,* 11 Cl.Ct. at 37. As to the phrase "at the site," we believe a reasonable interpretation thereof to obviously mean—"at the [contract] site." *See* discussion, *infra.*

**250.** *Id.*

**251.** Proof by a "preponderance of the evidence" is defined by McCormick as proof "that the existence of the contested fact is more probable than its non-existence." McCormick, *Handbook of the Law of Evidence* 677 (1954). *DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1200 (3d Cir.1978).

**252.** Throughout this case, and in particular in its post-trial submission, plaintiff has argued vigorously that the purpose of a differing site

condition clause is to "allocate[ ] directly to the government" "[t]he risk of subsurface operations." PPS at 118. This is so, says plaintiff, because absent such an allocation, contractors would be forced to include substantial contingencies in their bids which would cause the government to pay more for a job where in fact such contingencies may very well not materialize. In this way, it says the differing site condition clause works to the government's advantage in preventing inflated bidding while at the same time "shielding the contractor from the risk of loss for unforeseen subsurface conditions...." *Id.* citing *Foster Construction C.A. v. United States,* 435 F.2d at 887.

**253.** *See supra* at 26.

*States*, 11 Cl.Ct. 853, 857–58 (1987); *Mojave Enterprises*, 3 Cl.Ct. at 357. We next proceed to discuss each element seriatim.

### B. *Elements*

### (i) *Contract Representations Concerning Subsurface Conditions*

As recently noted by Judge Tidwell in the case of *Stuyvesant Dredging*, 11 Cl.Ct. at 858, a differing site condition claim "stands or falls upon what is indicated in the contract documents." We thoroughly agree. *Accord P.J. Maffei*, 732 F.2d at 916; *Foster Construction*, 435 F.2d at 881. And, to this pointed observation, we hasten to add that the indicated subsurface conditions (if any), as well as the encountered subsurface conditions, must specifically relate to "the [same contract] site." Where the contract contains no affirmative (positive or negative) representations of the subsurface conditions, purportedly relied on by the contractor, the government has no liability. *Cf. STG Construction Co., Inc. v. United States*, 157 Cl.Ct. 409 (1962), and *Ragonese, et al v. United States*, 120 F.Supp. 768, 128 Ct.Cl. 156 (1954). In such a case, the substance of the plaintiff's averment is more akin to a miscalculation, *i.e.*, the assumption of a perceived fact which proved erroneous. While unfortunate, nevertheless, it is a risk for which only the contractor must assume responsibility. We believe that this scenario mirrors the operative facts in the case at bar regarding the issue of excess quantity.

Despite the firmness of this rule, the interpretation of contract indications is not a matter of precise science as one would perhaps desire. *See infra.* In that connection, plaintiff here makes much of the fact, and we agree, that the value and purpose of a differing site condition clause is to save the government money by cutting down on the insertion of speculative cost contingency amounts, thereby removing uncertainty from the contractor's perspective. This court and our predecessor court have previously noted this policy. *See, e.g., Fox v. United States*, 7 Cl.Ct. 60, 64 (1984); *Foster Construction*, 435 F.2d at 887; *Ruff v. United States*, 96 Ct.Cl. 148, 164

(1942). In practice, however, as is perhaps illustrated by this case, a contractor may not always accurately anticipate the rather esoterical legal standard by which the contract representations will be judged. As a result, what the contractor might have thought were reliable and viable affirmative contract indications/representations, *as to separate quantities of various materials*, could, as here, turn out to be no representations at all. As a result, the contractor in such case is left both without a substantive remedy and also without having noted and provided for such a contingency amount in its bid.

Be that as it may, our threshold task, as charged, is to interpret the plaintiff's contract within the framework and the guidelines set by the Federal Circuit and our predecessor Court of Claims. In this regard, our proper perspective in viewing a case such as here, has been described as this court stepping "into the shoes of a 'reasonable and prudent' contractor" to decide how "such a contractor would act in [the plaintiff's] situation." *P.J. Maffei*, 732 F.2d at 917 *quoting H.N. Bailey & Associates v. United States*, 449 F.2d 387, 390, 196 Ct.Cl. 156 (Ct.Cl.1971). Further, we are instructed to note that affirmative contract representations may nevertheless exist, although the "contract 'indication[s]' need not be explicit or specific...." *P.J. Maffei*, 732 F.2d at 916. However, even in such case, "the contract documents must still provide sufficient grounds to justify a bidder's expectation of latent conditions materially different from those actually encountered." *Id.* In substance, "there must be reasonably plain or positive indications in the bid information or contract documents" of the facts plaintiff relies on in making its differing site condition claim. *Pacific Alaska Contractors, Inc. v. United States*, 436 F.2d 461, 469, 193 Ct.Cl. 850 (Ct.Cl.1971). *Accord P.J. Maffei*, 732 F.2d at 916; *Stuyvesant Dredging*, 11 Cl.Ct. at 858. Against this background, we now look to the operative facts in addressing the primary issue regarding this element which is—whether the contract documents asserted, directly or indirectly, that plaintiff in dredging the project would encoun-

ter a specific *quantity* of gravel and eu-taw, as well as a specific *size* of gravel.

The Bidding Schedule attached to the original IFB, which facilitates the formulation of a contractor's bid, fragmentizes the subject work project into four component parts as follows:

| Item | Estimated Quantity | Unit | Unit Price |
|---|---|---|---|
| Mobilization and Demobilization | 1 | Job | XXX |
| Clearing and Grubbing | 1 | Job | XXX |
| Dikes and Waste Weirs | 1 | Job | XXX |
| Excavation | 7,028,000 [1] | Cu. Yd. | |
| TOTAL BID | | | |

[1] Includes required dredging and allowable overdepth as specified and shown on the drawings [254]

As is evident, the line item for "excavation" states that the estimated quantity of *total* cubic yards of *all* materials to be dredged is 7,028,000, including *allowable overdepth*.[255] This gross figure was later increased by amendment on January 31, 1979, to 7,789,200 cubic yards; however, it was still expressed as an *estimate* of the *total* cubic yards of *all* materials to be dredged.[256] This "reasonably plain" and "positive indication in the bid information" relating to gross cubic yards is, as a matter of law, an appropriate example of a contract indication. *P.J. Maffei*, 732 F.2d at 916. It is concise, unambiguous and unequivocal.

Next, we note that the appendix to the Corps' IFB also contains a number of specific and detailed contract indications. However, these indications relate to the *character* and *nature* of each of the anticipated subsurface materials to be dredged (*i.e.*, sands, clays, fines, gravel, eutaw, etc.), *as distinguished from the specific quantity of each such material.* These indications are found in the logs of the 156 borings taken by the Corps (1973–75) in order to inform bidders of subsurface conditions and the general nature of materials surrounding the proposed contract site. The various subsurface conditions disclosed by the 156 borings were classified in logs by means of descriptive terms which correlated with the standard criteria as proscribed by the Unified Soils Classification System (USCS).[257] These recorded descriptions were in the form of rather detailed labels such as "Br. Silty Sand", "Brown Clayey Sand," or "Brown Poorly Graded Gravel," and they were positioned on the log to correspond to the specific strata of the boring core diagram. We find that these various material descriptions contained in the 156 boring logs were intended to depict for the prospective bidders the general character and nature of the materials expected to be found in the subsurface project area reasonably contiguous to where the borings were taken. Almost every strata, of each boring core diagram, contains such a description along with a number indicating the depth at which the particular strata of material was found. Other pertinent data as to where, when, and how each boring was taken is also recorded on the logs.

We believe, therefore, that a reasonable and prudent contractor would conclude, based on the contract boring logs, that the government was positively representing the *overall character* of the *type* of materials to be expected and, within certain reasonable limits, where such materials would be found *within the contract area.* For example, a reasonable reading of the boring logs, in general terms, would indicate that the contractor should expect to dredge silts, clays, sands, gravel, and eutaw within the contract area. Moreover, a fair and reasonable reading of the logs further indicates that various grades, types, or varieties of each of these subsurface materials would be encountered. In particular, some logs even went so far as to indicate the borings had unearthed "gravel, 1' max" in size.

Plaintiff has claimed, however, that the boring logs contained indications rising to the level of "clear and direct representations of subsurface conditions that a contractor could reasonably expect to encoun-

254. PX 1 at BS–1.

255. *Id.*

256. *See* PX 20.

257. PX 1 at A–1 (appendix).

ter." [258] As we have pointed out *supra,* to the extent this refers *only* to the *character* and *nature* of the subsurface materials, we would, of course, agree. However, we observe that plaintiff clearly implies something more. In fact, it is the substance of the plaintiff's claim that the boring logs, in conjunction with the USCS, were *ipso facto* a reliable, intended, and definitive indication of the reasonably approximate, if not the precise, quantity of each of the subsurface materials across the entire contract site. It is not at all clear from the contract documents how the plaintiff vaults from the clear and unambiguous language depicting *only* the character descriptions of each material in the several boring logs, to a claim that the government was simultaneously warranting the approximate, if not the precise, quantum of *each* category of subsurface materials *by those same character descriptions.* As we have already noted, the only clear and unambiguous *quantity* estimate we find contained in the contract is the *gross* estimated total quantity of *all* subsurface materials to be excavated in the aggregate, *i.e.,* 7,789,200 cy.

Nowhere do we find, nor has the plaintiff shown us, that these contract documents by clear and direct representations assert any *specific* quantities of particular subsurface materials expected to be the product of the dredging project. This is true notwithstanding the plaintiff's assertion that by *classifying* the materials according to the USCS the government somehow included a contract indication which allegedly provided the plaintiff with the means to bridge this gap for bid purposes. The incontrovertible fact is, as clearly stated in the IFB, the USCS was only referenced as a means to "classif[y]" the various materials disclosed by the core of the boring:

> *Soils are classified* in accordance with the Unified Soils Classification System, Technical Memorandum No. 3–357 dated April 1960 for civil projects and Military Standard 619B dated 12 June 1968 for military projects.[259]

Giving ordinary words their ordinary meanings would readily indicate that by utilizing the word "classified" the Corps meant—"to arrange in classes according to subject matter; and to assign to a category." [260] Without question said definition of the word "classified" in no way encompasses the verb "to quantify." They clearly are *not* synonymous terms, and it would therefore be unreasonable and erroneous, as a matter of law, for this court to so hold. That the Corps classified or categorized the subsurface materials according to the USCS in no way raises these descriptions, in the contract boring logs, to clear and direct indications of the approximate, if not the precise, quantum of each subsurface material within the contract area.

Moreover, what each boring log indicated thereon, as to the *location* of the various materials depicted *between* the several logs and throughout the project area, is relatively even less precise. Plaintiff has claimed that it found both gravel and eutaw in cut areas where several contiguous boring logs allegedly indicated there would be "none." To make this foregoing claim, plaintiff has admitted that it relied entirely and solely on *its* extrapolations from the contract boring logs. The method of extrapolation plaintiff used to determine what the government allegedly "represented" would exist *between* the borings, however,—the area where the alleged differing condition was found—was no more a contract indication than those alleged as to quantity. In fact, as we demonstrate below, the contract indications that plaintiff requests we find, as to location, are no more than hospitable assumptions, which, while necessary for the bid to proceed, are nonetheless *entirely of the contractor's own making.*

A more complete understanding of the unreasonableness of Weeks' interpretation of what the government represented may best be seen following a brief explanation of how Weeks' conducted its bid preparation process. At the outset, the Corps provided Weeks with a large set of site maps

---

258. PPS at 121.

259. PX 1 at A–1 (appendix).

260. *Webster's New Collegiate Dictionary* at p. 206 (1976).

in order for Weeks to undertake its bid preparation analysis and its pre-bid site investigation.[261] These plans contained scaled drawings of the river for purposes of channel alignment. The plans also contained clear indications as to where the Corps' 156 soil borings were taken including a reference number for each boring which correlated to a boring log attached to the IFB.

As its first step in the bid preparation process, plaintiff plotted these borings on a side view drawing of the contract site in order to construct a "soils profile" of the areas to be excavated.[262] Mr. Rice testified that the soils profile was "a way of looking into the side of the cut and see before me a picture of the materials, [and] how they lay in this cut area from the beginning to the end."[263] In order to construct this profile, plaintiff first "assume[d]" that the borings were actually taken from the *center* of the *excavation* site, when in fact the site plans clearly indicated that the borings were taken, primarily, on either *side* of the proposed channel and *not* in the center, except, of course, in cut-off areas.[264]

With the descriptions of the individual borings plotted, Mr. Rice next needed to fill in the "gaps" between the several borings to make his diagram continuous. Clearly, as discussed *supra*, the boring logs themselves did not purport to reflect a *continuous* stratified depiction of materials throughout the project area, nor did they contain a methodology approved by the Corps for doing so. In fact, even Mr. Rice conceded that—"It was not all continuous uniform material, by any means."[265] Therefore, in order to get over this void, Mr. Rice again *assumed* "what you see on a boring ... was true halfway to the next boring. And then halfway to that boring, halfway to the next boring...."[266] Utilizing this assumption, an assumption adopted totally at the plaintiff's discretion, Mr. Rice then simply "connected the dots", if you

will, among the assumed half-way extensions of strata of material between each contiguous pair of borings. Once connected, the plaintiff arrived at a continuous diagram depicting *its perception* of what the government was representing to be the materials throughout the entire project site based on the contract boring logs.

■ Based on the soils profile and USCS described *supra*, plaintiff geometrically calculated the quantity of each type of material indicated on the profile by totalling, in terms of cubic yards, the volume of each strata to be excavated. Then by using these volume figures, plaintiff was able to conclude for itself that a certain percentage of the entire excavation would be clays, sands, or gravels, etc., and that certain entire cut areas (as broken down by the plaintiff) contained little to no gravel or eutaw, etc., at all. It is *these* estimates of the quantity of each subsurface material expected to be dredged in specific contract areas which have been presented to this court as the precise "contract indications" which led the plaintiff to conclude that it had encountered a differing site condition.[267] Our threshold rhetorical question is, therefore, whether a reasonable and prudent contractor would have interpreted the contract documents as warranting a continuous uniform strata of materials throughout the contract area *as transformed by the plaintiff's unilateral assumptions*. In short, we think not. *See Stuyvesant Dredging*, 11 Cl.Ct. at 859 (re the impact of a contractor's assumptions on the contract indications).

As we have demonstrated, it is the plaintiff alone who engaged in various unilateral assumptions and extrapolations, in order to calculate its materials quantities between the several borings. Plaintiff apparently has misread the boring logs to guarantee the continuous composition of subsurface materials, ultimately, across the

**261.** *See* PX 16.

**262.** *See* PX 17.

**263.** Tr. at 661.

**264.** Tr. at 661; compared with PX 16.

**265.** Tr. at 658.

**266.** Tr. at 670.

**267.** *See* PXs 18, 19, and 25.

entire project site. Such assumption, which gave rise to the plaintiff's conclusions as to where *each* type of material would be located throughout the *entire* site, were neither indicated, nor otherwise contained within the contract documents and thus cannot, as a matter of law, be thrusted upon the government to form the basis of a differing site condition claim. *P.J. Maffei,* 732 F.2d at 916.

In sum, we believe it is painfully clear that the plaintiff's differing site condition claims, as to quantity and location of materials, are based *not* on any clear contract indications, but upon independent factual assumptions for which only it, as the maker of those assumptions, can bear final responsibility. That plaintiff, in using those assumptions, proceeded to miscalculate the quantity and location of the subsurface materials, is a burden the plaintiff must bear. The case law is quite clear that contractors are not to receive equitable adjustments for miscalculations they have engaged in by misreading contract documents. *Roscoe-Ajax Construction Co. v. United States,* 458 F.2d 55, 60–61 (Ct.Cl. 1972); *Perini Corp. v. United States,* 381 F.2d 403, 415 (Ct.Cl.1967); *Leal v. United States,* 276 F.2d 378, 384–85 (Ct.Cl.1960). By analogy, we believe this point is equally valid to the miscalculation here. *See also Blauner Construction Co. v. United States,* 94 Ct.Cl. 503 (1941).

In *Leal,* for example, an inexperienced contractor misread the contract documents to conclude that no subsurface water would be encountered. *Leal,* 276 F.2d at 378. In *Perini,* the government sought relief for miscalculating the amount of water plaintiff would be required to pump, and for which it would pay, under the contract. *Perini,* 381 F.2d at 403. In either case, because of the claimant's *own* error in interpreting the contract documents, the Court of Claims found the structure of a differing site condition clause an inappropriate mechanism for relief. In the case at bar, Weeks' misinterpretation of the contract indications resulted in it miscalculat-

ing certain materials quantities and locations. Weeks now claims a differing site condition where the basis of that claim is not a correct reading of the contract documents, but an incorrect reading embellished by assumptions not found in the contract documents. Like in *Leal* and *Perini,* Weeks' claims must be rejected as well.

In addition, we would be remiss if we did not point out several indications in the contract documents which would lead a *reasonable and prudent* contractor to conclude that the government did *not* intend the boring logs to be indicators of the specific quantum and/or location of each of the various subsurface materials *throughout the entire contract site.* First, by supplying boring logs containing numerous gaps in greatly varying lengths, with material descriptions in intentionally general terms, and logs ranging randomly from one side of the river to the other in distances of 300 to over 1,000 feet apart, it can hardly be said that the government would warrant, against this background, the separate quantum of each subsurface material determined to be dredged by a contractor.[268] Yet this is precisely what the plaintiff claims the government warranted. Our response is we do not agree with the plaintiff. Rather, we believe that given the state and locations of the boring logs, taken as whole, a reasonably prudent contractor would have realized the relatively *limited scope and utility* of the information the government was *intending* to provide relative to the intervening subsurface materials between the logs throughout the *entire* contract site.

Second, there is the issue of the allowable overdepth. While this issue is far more critical in our ultimate determination *infra,* it also has some bearing on an interpretation of what the government was indicating through the contract boring logs. As noted *supra,* the contract expressly provided that Weeks was to be paid for up to one foot of overdepth dredging, *i.e.,* one

---

**268.** *See, e.g.,* PX 1 at A–1 (appendix) logs for boring numbers 19A, 19B, 20, 20A, 20B, 21A, 21B, 22A, 23, 23A, 24, 36, 41, 41A.

foot beyond the floor of the *required* pay template.[269] In several instances we note that the contract borings did not reach down to the bottom of this allowable over-depth. A reasonable contractor would have gleaned how this shortfall would have impeded its ability to make the very claims the plaintiff makes right from the outset. This, if nothing else, is a solid indication that the government did not intend or purport to indicate that the boring logs represent the precise quantities and/or locations of the various materials across the entire contract site as plaintiff suggests.

We are reminded that "[w]hile a contractor need not demonstrate that its interpretation of the contract is the *only* reasonable one, it does bear the burden of showing that its construction is at least a reasonable reading." *P.J. Maffei*, 732 F.2d at 917 *citing Max Drill, Inc. v. United States*, 427 F.2d 1233, 1245 (Ct.Cl.1970). We believe our examination of the contract documents shows that the government in no way intended to warrant, by including the boring logs, either the mathematical quantities of the various materials components, or their location across the entire contract site. It is clear on these facts and we find, therefore, that the government provided the logs and bidding schedule in an effort to assist bidders in understanding the *total* quantity of *all* materials to be dredged in gross, and their *general* nature, character, and location. We believe the contract documents at bar would have apprised a *reasonable* and prudent contractor of as much, and actually depicted no more.[270]

(ii) and (iii) *The Reasonableness of Plaintiff's Interpretation of the Contract Indications And Reliance Thereon*

Both the second and third elements of the plaintiff's claim focus on the essential point of the *reasonableness* of the plaintiff's conduct in interpreting the contract documents, and utilizing that information to arrive at its bid. Because these two issues both relate to the plaintiff's overall pre-award conduct, with a common viewpoint being the reasonableness thereof, we believe that they are best addressed, in the interests of logic and brevity, as a single element. We proceed, therefore, with our analysis on that basis.

■ As a threshold observation, we note that much of what we said relative to the plaintiff's misinterpretation of the contract indications, and the plaintiff's many assumptions, is also relevant to a determination of the reasonableness of the plaintiff's pre-award conduct discussed *infra*. As before, our standard is to judge the plaintiff's "reasonableness" from the perspective of a reasonable and prudent contractor acting under similar conditions. *See P.J. Maffei*, 732 F.2d at 917. Our conclusion is that, on the facts here, plaintiff was unreasonable in its pre-award conduct for failing to adjust its bid to take into account the risks associated with *two critical assumptions* which, when taken together, thoroughly impacted upon its estimation of all classes of expected materials (gravel, eutaw, oversize gravel, etc.). We believe that given the significance of this misinterpretation, relative to the *precise materials estimates* plaintiff relies on for *each* of its claims, the plaintiff's bid estimate does not manifest sufficient evidence of either reasonable reliance upon, or interpretation of, the contract indications as required.

As noted *supra*, plaintiff's first assumption, in making its subsurface soils profile, was that borings had not been taken from the *banks* of the river, but rather that they *all* had been taken from the very *center* of the channel plaintiff was to dredge.[271] In

---

**269.** *See* PX 1 at BS–1.

**270.** "To hold otherwise would effectively render the Government unable to [provide] ... a potential contractor [with] ... possibly helpful information without undertaking to stand on" the reasonable use thereof. "If, on the other hand, the Government tried to protect itself from lawsuits such as this one by withholding a potential source of information, it might be found liable to a contractor for not disclosing its 'superior' knowledge. *See, e.g., Hardeman-Monier-Hutcherson v. United States*, 458 F.2d 1364 (Ct.Cl. 1972). The Differing Site Conditions clause cannot be read to create such a pointless predicament." *P.J. Maffei*, 732 F.2d at 918.

**271.** Tr. at 661.

reality, only approximately 15 borings were taken in the center, while 141 were taken from the banks (*see* PX 16). The necessity of this assumption by plaintiff, however, is quite apparent. Knowing that it was planning to extrapolate from each boring to make its subsurface profile, plaintiff would have *at best* desired to do so with a minimum amount of such extrapolation. By assuming that *all* borings were located on a path substantially down the very *center* line of its project, the length of the overall extrapolation among all the borings would have been at a minimum. As a result, theoretically, any extrapolation risk would also have been minimized as well. Quite naturally, the farther away the borings are from the contract site, the longer the extrapolations, and the greater the likelihood of inaccurate predictions. The plaintiff's center line assumption, we believe, fictitiously minimized this risk.

From another perspective, there was also a downside to *assuming* plaintiff's "best case" scenario. The problem with the plaintiff's assumption was that, in fact, most of the borings were actually *not* in the center, but on the banks, of the river channel. To the extent plaintiff *assumed* these borings were in the center of the river, the plaintiff's bid was based on center line extrapolations. Against this background, plaintiff's entire bid was based, in major part, *not* on the subsurface conditions of the actual channel it was required to dredge, but on the conditions of a channel which *it assumed* existed conformable with the broad and general indications in the boring logs. The record is totally void of any evidence indicating that plaintiff performed any quantitative adjustment to its bid to account for the substantial risks associated with this threshold assumption.

Plaintiff's second significant assumption relates to its extrapolation from, and interpolation between, the 156 borings. This assumption, in the words of Mr. Rice, was as follows:

> Mr. Rice: In other words, what you see on a boring, I assumed was true halfway to the next boring. And then halfway to that boring, halfway to the next boring, this boring I said would be true. So I thread those materials across my cross sections that I used for materials calculations to get their influence in the project as to how much of each quantity there would be.[272]

Plaintiff has explained that it utilized this assumption because it claims it was a standard way to reasonably interpolate *between* the borings, absent any evidence to the contrary. Clearly, we do not fault the plaintiff for utilizing this methodology.[273]

However, our primary concern relates to the availability of other probative evidence regarding the surrounding subsurface conditions that would call into question the reasonableness of this assumption relative to the areas where plaintiff later encountered alleged excess gravel. We have reviewed the record and find evidence which we believe should have suggested to a reasonable and prudent contractor the likely existence of gravel in greater percentages than that which plaintiff expected based on a mere extrapolation laterally and below the boring logs. In the face of such evidence, we find that it would be unreasonable not to increase the expected quantum of gravel to reflect such increased probability of encountering greater amounts of this material than anticipated. We believe available collateral evidence of this magnitude was present, but that plaintiff once again acted unreasonably in failing to make a sufficient inquiry so as to facilitate an appropriate adjustment to its bid.

---

**272.** Tr. at 670.

**273.** In fact, plaintiff's expert Thomas Turner confirmed that this was a reasonable technique. Tr. at 1867–69. We are quick to note, however, that Mr. Turner *does not* address whether there should also be adjustments to take into account the obvious risks associated with this assumption. As noted *infra*, we do not quarrel with plaintiff's or Mr. Turner's assessment of using this technique. Rather, we quarrel with the fact that neither plaintiff, nor Mr. Turner, acknowledges that the vast risks associated with this assumption should reflect an adjustment. In our opinion, a reasonable contractor utilizing such risky assumptions would adjust its bid quantities to take into account these risks.

The available collateral evidence we are referring to indicates primarily the likelihood of encountering gravel in greater quantities than those depicted on the boring logs. First, as background, we note that in its actual dredging on the Ten-Tom, plaintiff encountered the vast majority of its claimed excess gravel in the northern half of the project—from roughly cut area # 11 to cut area # 21.[274] Of the total 1,092,050 cy of alleged excess gravel claimed, approximately 78% was encountered in these cut areas.[275] Outside of virgin dredging at Buzzard's Island and Hariston Bend cutoff, dredging between cut areas # 11 and # 21 primarily involved widening the river channel by cleaning up material deposits or build-ups along the *inside* banks of several pronounced bends or meanders in the river.[276] The project site plans clearly indicated that the plaintiff was required to do little to no dredging on any of the *outside* banks of these bends as the existing depth thereat was already sufficient due to the lack of any previous materials deposits or build ups.[277]

Second, against this background, there is the impact of gravel in-flow from two upstream tributaries into the Ten-Tom, one of which entered the Ten-Tom at the northernmost (upstream) point of the plaintiff's project site. The critical evidence in this regard comes from Defendant's Exhibit 56, an enlarged map of the county (Lowndes County, Mississippi) containing the northern half of the plaintiff's project. That map contains approximately 67 red dots purporting to represent sand and gravel mining operations in the vicinity of the Ten-Tom River and its tributaries. The two critical tributaries we noted, *supra,* are the Buttahatchie River, which enters the Ten-Tom some 14 miles north (upstream) from the northern end of the plaintiff's project site, and the Luxapalila River, which enters the Ten-Tom just north of the northern end of the plaintiff's project site.

The presence of the *many* gravel and sand mine operations contiguous to these two rivers clearly corroborates the testimony of defendant's soils expert (Dr. Lang) that these eastern tributaries contained significant gravel, and they carried that gravel with them as they emptied into the Ten-Tom River. Accordingly, in the words of defendant's expert, they truly "supply the gravel into the Tombigbee River valley." [278]

While the location and proximity of the gravel in-flow from these two tributaries is a potent circumstance in and of itself to suggest the presence of *substantial* gravel in the subject project area, there is yet a third fact in evidence which compels this conclusion to an even greater likelihood. That evidence relates to the normal pattern of materials deposits in rivers which contain numerous meanders such as the Ten-Tom. Defendant's soils expert (Dr. Lang) further testified that as a general principle, heavier materials being carried by a river tend to settle out or deposit along the *inside* banks of bends or meanders in the river.[279] This is so because as a river rounds a bend, its velocity is maintained towards the *outer* bank, but velocity tends to decrease along the *inner* bank. This theory is corroborated, in fact, by the pattern of dredging which Weeks was asked to undertake on the Ten-Tom. As we described *supra,* and because of this phenomenon, materials build-ups, or deposits which required dredging, occurred on the *inside* banks of river bends, but not (or very little) on the outside banks.[280]

The significance of these three fact circumstances regarding the lay-out of plaintiff's project, the gravel in-flow, and the materials deposits, would have, we believe, changed a reasonable contractor's view, from that of plaintiff's, with regard to expected gravel in and around the banks on the *inside* of the several meanders where

274. *See* PX 38. We use plaintiff's recalculated figures here for demonstration purposes only.

275. *Id.*

276. *See* PX 16.

277. *Id.*

278. Tr. at 3177.

279. Tr. at 3520–35.

280. *Id.*

the plaintiff was required to dredge—and, not surprisingly, where it later encountered approximately 78% of its "unanticipated" gravel. This circumstance obtained because the substantial gravel in-flow was carried underwater and deposited thereat by the river itself, and would *not* have been detected by the naked borings which were taken both *inland* from the submerged banks of the river, and perhaps *years before* any of the deposits were even detectable.[281] In fact, *all* of the approximately 63 borings found between cut areas # 11 and # 21 (inclusive) fit this description. Therefore, absent any *actual* data from within the submerged banks themselves, this theory of gravel in-flow and deposit would have, at the least, prompted a reasonable contractor to modify its general extrapolations to take into account the substantial likelihood that excess gravel, as allegedly found, would indeed be encountered.

The record is clear beyond cavil that Weeks actually knew of the existence of gravel operators in the area of its project site.[282] Mr. Rice testified that he noticed them during his site investigation.[283] However, Mr. Rice failed to even attempt to contact or interview any of these gravel operators.[284] Defendant's expert testified that any one of such persons could have explained to Mr. Rice the extent of tributary gravel in-flows, and that substantial gravel would most likely be found deposited on the inside banks of the various river meanders.[285] Mr. Rice did not have this likely information because he failed to interview gravel operators in the area, while at the same time he was clearly on notice of both their proximity and frequency in and around the project site. This failure to act by reasonably inquiring (and to make any necessary and appropriate adjustment to its boring extrapolations), in light of the foregoing circumstances, we find was

clearly unreasonable on the part of the plaintiff.

In sum, then, we fault plaintiff not for generally making the assumptions that we have addressed, but for failing to recognize the significant downside to those assumptions and making appropriate adjustments to its bid therefor. In "moving" the borings to the center of the river to perhaps minimize extrapolation risk, plaintiff clearly based its bid on facts *contrary* to those stated in the contract documents. Inasmuch as the borings were the *only* actual data for its materials estimates, this assumption undoubtedly changed the entire character of the extrapolations plaintiff made therefrom. Similarly, in failing to contact and interview gravel operators plaintiff clearly knew existed, plaintiff was self-deprived of likely important information concerning how its extrapolations between borings might very well have *underestimated* its calculation of expected gravel. Ironically, plaintiff is now here to claim an equitable adjustment that this very underestimation may have substantially caused. In both instances, as explained *supra*, we believe a reasonable contractor would have acted otherwise.

(iv) *The Actual Subsurface Conditions Encountered Must Differ Materially*

Having concluded that plaintiff has failed to carry its burden with respect to the first three elements discussed *supra*, it would appear that any further discussion of the plaintiff's claims would be perhaps academic. In spite of the foregoing, we have, nevertheless, decided to make findings regarding all remaining elements respecting the alleged differing site condition claims. For purposes of this analysis, we *assume, arguendo*, that plaintiff has indeed carried its burden with respect to elements (i), (ii), and (iii) (but we do not so find). We proceed in this manner in order to establish that there are other independent bases for rejecting the plaintiff's ex-

---

**281.** The vast majority of borings are dated as having been taken in 1973–74, some five to six years prior to this contract. *See* PX 1 at appendix.

**282.** Tr. at 1012–13.

**283.** *Id.*

**284.** *Id.*

**285.** Tr. at 3177–78.

cess gravel, eutaw, and oversize gravel claims, in addition to those deficiencies already noted *supra.*

### a. *The Legal Criteria*

The fourth fundamental element of a differing site condition claim is primarily factual in nature—*i.e.*, the *subsurface conditions actually encountered* (re gravel and eutaw), must *differ materially* from those depicted in the contract documents within the same project site. Plaintiff claims that, based on the information summarized in its daily dredge reports, it has conclusively proven that it in fact encountered quantities of gravel, eutaw, and sizes of gravel, all materially in excess of those represented in the contract documents. In particular, plaintiff claims that the daily dredge reports prove that Weeks actually encountered 24.9% gravel, as opposed to the 8.1% depicted in the contract documents; 161,-305 cubic yards of eutaw, as opposed to the 62,350 cubic yards depicted; and graded gravel up to three inches in size, as opposed to three-fourths of an inch depicted gravel.

■ In assessing the probative value of plaintiff's proof, with regard to subsurface conditions actually encountered, we believe that it is basic and fundamental that such proof *must* encompass a comparison of the subsurface conditions, both estimated and actual, contained within the *precise work site as defined in the parties' contract, i.e.*, the maximum pay template. The operative language in the Differing Site Conditions clause of subject contract, as quoted *supra,* makes this conclusion abundantly clear. We repeat the critical portion of that provision here:

> (a) The Contractor shall promptly ... notify the Contracting Officer ... of ... *conditions at the site* differing materially from those indicated in the contract. . . .[286]

What this means, and we so hold, is that any contract indications relied on by the contractor can only form the basis of a

differing site conditions claim to the extent that they (*i.e.*, the contract indications) are "at the site," in this case *the maximum pay template.* Likewise, any proof of actual conditions encountered, proffered by the plaintiff to establish a differing site condition, is similarly relevant only to the extent that it represents those conditions encountered "at the site," in this case, *the maximum pay template.*

### b. *Plaintiff's Failure Of Proof With Regard To Actual Conditions "At The Site"*

■ While this need to compare only those subsurface conditions, *i.e.*, expected and actual, within the *same site* may seem to state the obvious, it appears that in the case at bar, the plaintiff may have, in fact, missed the obvious. Plaintiff's operative proof of actual conditions encountered fails this fundamental test because the daily dredge reports simply do *not* summarize and quantify the various materials dredged only from within the contract site, *i.e.*, the maximum pay template. The daily dredge reports, as candidly admitted by the plaintiff, are simply a summary of materials taken indiscriminately from *both* the area within the maximum pay template, *and* the area of non-pay overdredging outside of the maximum pay template.[287] (It is critical to this issue to observe and recognize that plaintiff also candidly admitted that of the gross cubic yards *actually dredged,* 20–25% thereof was outside of the maximum pay template.)[288] Thus, the essential source congruity required to compare the conditions (materials) expected "*at the site,*" and those actually encountered "*at the [same] site,*" does not exist.

This fatal flaw which we find in the plaintiff's proof, therefore, leaves this court in the unacceptable position of having to speculate as to the true character, nature, and quantity of each of those various materials which were actually dredged *within "the [contract] site," i.e.*, the maximum pay template. For example, plaintiff

---

**286.** PX 1 at General Provisions page 1.

**287.** *See* PX 34; Transcript of Closing Argument, June 15, 1987, at p. 145.

**288.** Tr. at 1481.

relies on the daily dredge reports to establish that it actually encountered 24.9% gravel in dredging subject project. This figure may very well be true *to that limited extent,* but it is not probative of the relevant issue here because the record does not show whether the *excess* gravel, implicit in this 24.9% figure, came from within the requisite contract site, or whether it came from the area of plaintiff's admitted overdredging—*i.e.,* the area outside of the contract site with respect to which the government did not ask the plaintiff to dredge nor is the plaintiff entitled to receive pay.[289] If we were to compare the 24.9% alleged actual gravel dredged with the 8.1% estimated gravel depicted in the contract documents, as suggested by plaintiff, we would in actuality be comparing "apples and oranges." This would clearly be so because the 8.1% estimated gravel stems solely from source "A" (the maximum pay template) whereas the 24.9% gravel stems from sources "A and B" (within and without the maximum pay template). Accordingly, we believe it would be clear legal error for this court to find plaintiff to be entitled to an equitable adjustment where symmetry of proof is wanting as to *"the [contract] site."* We are constrained to conclude that the same conclusion is equally true with the dredge report data as to alleged excess eutaw and oversize gravel as well.

Plaintiff's attempt to discredit this fundamental incongruence falls short of the mark. In this connection, it argues that the figures of 24.9% actual, and 8.1% expected, gravel are comparable because it has also proven that the materials composition of the subsurface within the areas of admitted overdredging (both lateral and below the maximum pay template) is the same as that within the maximum pay template.[290] As a result, argues plaintiff, the actual gravel percentages both within and outside the maximum pay template would be the same, allegedly rendering the 24.9% figure an accurate representation of the actual gravel component within the maximum pay template.[291] We perceive the foregoing to simply reflect an afterthought, and thus, do not agree with the plaintiff's hospitable characterization of its proof in this regard. Plaintiff's "evidence" with regard to the quantity of each of the subsurface materials both laterally and below the maximum pay template is really self-serving and based on mere speculation. In fact, we find that it is premised on nothing more than the same type of speculative extrapolation, between and among the borings, that we have commented on previously.

We believe that independent of the fact that this type of extrapolation was not a part of the contract indications as noted *supra,* it is, by the admission of one of plaintiff's own witnesses, an inherently unreliable technique. There is testimony in the record by one of plaintiff's own expert witnesses that the composition of the materials below a particular boring can have a strata of material three to four feet in width or it could vary or change within as little as *6 inches* below that particular boring.[292] Given the foregoing, and in the words of this same expert witness, such extrapolation and interpolation is nothing more than "rank speculation."[293] Against this background, we simply cannot accept the quantifications of plaintiff's speculative extrapolations and interpolations as sufficient proof to make a finding in plaintiff's favor relative to the percentages of encountered materials within the same site. Therefore, we must reject plaintiff's contention that it has proven the composition of the subsurface materials within the overdredged areas (both lateral and below the pay template) to be the same as those within the pay template.

Moreover, with respect to the foregoing, we believe that the only persuasive direct probative evidence on this point supports a

---

**289.** *See* note 27 *supra.*

**290.** Transcript of Closing Argument, June 15, 1987, at 146–47.

**291.** *Id.*

**292.** Tr. at 4598–99.

**293.** Tr. at 4597 (Dr. Kondner).

finding that the subsurface material contents *below* the maximum pay template were more likely to be different, harder materials (such as gravel and eutaw), when compared to those *within* the pay template.[294] As a general matter, this testimony indicates that the deeper you excavate, the more gravel you were likely to encounter; and that eutaw is generally the last formation, and usually continues on downward once encountered.[295] Independent of this testimony, and corroborative thereof, a visual inspection of the plaintiff's cross-section diagrams would lead one inescapably to the same conclusions.[296] It is quite apparent that on the cross-section diagrams where gravel is indicated, it is always at the bottom of the template, and once it begins, it continues on down to the end thereof. Of the more than 100 individual cross-sections, approximately 25 that show gravel *all* follow this pattern. The same is true of those cross-section(s) showing eutaw: it always occurs as the *last* (deepest) formation, and, once encountered, continues unchecked to the bottom end of the cross-section.

c. *The Inherent Unreliability Of Plaintiff's Daily Dredge Report Data*

█ As demonstrated *supra*, plaintiff's failure of fundamental symmetry in proof regarding the quantification of expected and actual gravel, eutaw, and oversize gravel, is clearly a valid basis upon which we may reject the subject claims and find that plaintiff has failed to prove that it encountered subsurface conditions materially different than those indicated in the contract documents. We also hasten to add that this is not the plaintiff's only failure of proof with regard to conditions actually encountered. We believe that even assuming, *arguendo*, that plaintiff's proof, as to actual and expected gravel, eutaw, and oversize gravel, was that the materials were dredged from the *same* contract site, such proof on the facts here,

based totally upon the daily dredge reports, would nonetheless be inadequate to carry the plaintiff's burden. This is so because we find that the circumstances surrounding the preparation and the maintenance of the plaintiff's daily dredge reports render the data, as to the percentage quantum of the various subsurface materials recorded thereon, inherently unreliable.

It is undisputed that plaintiff's only source of raw evidence of subsurface conditions actually encountered is that contained on the 818 daily dredge reports. As we noted at the outset, these reports, and the Corps' inspector's reports, were the only contemporaneous records of events as they allegedly occurred on the project. On the upper portion of each daily dredge report, plaintiff recorded, usually at 8:00 a.m. each day, its best estimate of the total cubic yards dredged during the preceding 24 hours, as well as a percentage breakdown with respect to the various materials dredged. For example, on the report for March 7, 1982, plaintiff estimated dredging 7,998 cubic yards of materials, consisting of 15% clay, 70% sand, and 10% gravel.[297] It is the sum of these daily estimates of each material, broken down into cubic yards for each type of material allegedly dredged, that form the primary basis for the figures plaintiff has presented as proof of subsurface conditions actually encountered.

Thus, it would not be an overstatement to say that the viability of the plaintiff's entire case substantially depends upon the credibility of the encountered materials percentage estimates derived from the daily dredge reports. This data is truly the core of the plaintiff's claim. Unfortunately for the plaintiff, we have substantial misgivings as to the credence to be given to the estimated percentages of the various dredged materials.[298] As we explain *infra*, plaintiff relied on an inherently speculative and unreliable methodology to arrive at

---

**294.** Tr. at 1165–66 and 1233.

**295.** *Id.*

**296.** *See* PX 18.

**297.** PX 34.

**298.** As to a similar observation made by the Corps of Engineers' *own* Board of Contract Appeals, *see Arundel Corp.*, 515 F.2d at 1120 n. 5.

said percentages of alleged encountered materials. In addition, plaintiff failed to present to this court certain critical evidence, through specific persons who determined, created, recorded, and/or reviewed the materials percentage data on those daily reports. More importantly, plaintiff failed to explain the absence of the testimony of such witnesses. We address each of the foregoing observations in turn.

### 1. *The Methodology Of Estimation*

Our first finding with respect to the credibility of plaintiff's daily dredge reports covers the inherent unreliability of the *methodology* plaintiff employed in gathering the data recorded thereon as "material[s] description." Specifically, we refer to the precise numerical estimates, by percent, of the various materials components allegedly dredged, *i.e.*, actually taken out of the river, during the period of the report. The explanation below illustrates the methodology plaintiff employed to arrive at these percentage materials breakdowns.

The setting is any one of plaintiff's disposal areas in which it deposited the dredged materials. It is a large, rectangular, desolate landfill, of some tens or even hundreds of thousands of square feet. It is surrounded by a man-made dirt dike, with a graded surface sloping downward to create a relatively level stagnant settling pond at the lower most bottom. The flat settling area at any given time during the dredging process contains at least four to five feet of standing water. Somewhere towards the river side of the disposal area is the open end of a large diameter discharge pipe, which enters the disposal area over a side dike, and also continues in the opposite direction into the river, where it eventually connects to the dredge itself. From this pipe there is continuously spewed a slurry of water mixed with the dredged materials (*i.e.*, sands, fines, clays, gravel and eutaw etc.) as a workman stands at a distance "eyeballing" its waterfall-like projection into the disposal area. Periodically, the scene is interrupted be-

cause the falling debris, *i.e.*, gravels and eutaw, occasionally pilling up at the end of the discharge pipe, requires a levelling process by a bulldozer.

Such activities in the disposal area necessarily continue, more or less, day and night whenever the dredge was in actual operation. Often this was upwards of 18 to 20 hours a day. Once a day, usually at 8 a.m., an estimate was made of the composition of all of the dredged materials dispensed from the discharge pipe into the disposal area over the past 24 hours.[299] It was *solely* a *visual* estimate of the various materials as they lay settled and settling in the disposal area.[300] These daily visual estimates of materials encountered were expressed on the 818 daily dredge reports in terms of precise component percentages, such as 40% clay, 50% sand, and 10% gravel.[301] As a predicate for the three differing site condition claims, plaintiff proffers these DDR estimates as containing conclusive and accurate measurements of the cubic yards of each category of material actually dredged from the river under subject contract. From our thorough and searching review of the evidence, we are constrained to conclude that the underlying circumstances and proof belie any such credence.

With regard to these visual estimates, there were, of course, limits as to the extent to which a naked eye could have reasonably and accurately quantified, for comparison purposes, the vast amount of substantive materials spewed in a waterfall-like fashion into the disposal area(s). Not to mention the virtually impossible task of visually separating between where today's materials began, and yesterday's ended. Added to this, there was also the supreme difficulty of viewing the layers upon layers of buried materials which anything less than a complete post dredging excavation would not have disclosed. Moreover, the materials were constantly being spread out and leveled, thereby muddling them with those preexisting in the same area. While plaintiff refuses to acknowledge and recog-

299. Tr. at 876–77.

300. *Id.*

301. *See* PX 34.

nize these serious deficiencies in assessing the probative value of its daily dredge reports, we cannot.

There are also serious questions concerning the plaintiff's methodology in estimating materials encountered that arise from the way said materials were deposited into each disposal area. Our understanding, based on the plaintiff's testimony, is that as the materials flowed from the disposal pipe, they dropped from the pipe to the ground, in distance, based on their relative weights, *i.e.*, the heavier particles dropping first and so on.[302] Those lightest materials, such as the fines and sands, often remained mixed with the water and found their way to the settling pond where they eventually submerged to the bottom.[303] In addition, some fines and sands drained with the water through the dike weirs and back into the river itself.[304] Needless to say, those fines, sands, and clays which were submerged in the settling pond, and those which returned to the river, obviously could not be viewed as part of plaintiff's visual estimation.[305] Accordingly, the materials components estimated for fines, clays, and sands are most probably *less* than was actually dredged. It logically follows, therefore, that any estimates of the remaining materials components would be weighted percentage-wise in favor of the more clearly exposed materials such as gravels, rock, and eutaw. However, the record is clear that plaintiff made no adjustment in its estimates to take into account this fact.

### 2. The Lack Of Certain Critical Evidence

Our second finding is that even were plaintiff's methodology for estimating materials components more inherently reliable, plaintiff has failed in its burden to establish the pertinent qualifications and credibility of several of the employees who were allegedly at the site actually performing the visual estimates. Such significant omissions, we believe, necessarily taint each and every percentage materials estimate on each and every daily dredge report. Given the overwhelming importance of these percentage materials estimates to plaintiff's entire case, we view it essential that plaintiff should have corroborated the foregoing critical data on the DDR by calling all persons who actually participated in estimating the various materials discharged into the disposal area. That they failed to do, with the exception of Mr. Rice.

In his testimony, Mr. Rice explained that for the first three months following commencement of the dredging (January 19, 1980), Mr. Nathaniel Hutchinson (superintendent) was responsible for estimating the percentages of materials dredged each day for recordation on the DDR; that Mr. Hutchinson had a "fair amount of experience" in estimating materials; Mr. Stringer and Mr. Wright, who were Mr. Hutchinson's assistants, were "worked with ... to help bring them up to a level where we felt that they could make these estimates"; after he (Rice) came on board, he "supervised their work"; that he (Rice) "would go out to the disposal area," after he came on board, "'every second day to every fourth day when I was on the job site"; and he stated "I believe so" when asked if Weeks' personnel were estimating accurately the percentages of materials to be recorded on the DDR.[306] Additionally, on direct examination, Rice testified regarding the materials in the disposal areas that—"[w]e would deliberately hold the water levels down ... so that we could see all of the material that we could."[307] However, on cross-examination, he freely admitted that when he went out to do the visual estimates in the disposal areas—"[t]here would be a pool [of water]," and that pool would be "[t]hree feet to 5 feet";[308] that when he and Weeks' personnel did their visual estimating in the disposal areas they did not physically look

---

**302.** Tr. at 1230–32.

**303.** Tr. at 1228–33.

**304.** *Id.*

**305.** *Id.*

**306.** Tr. at 879–81.

**307.** Tr. at 878.

**308.** Tr. at 1228.

at the materials submerged under water;[309] and that "[i]t might alter your visual classification a certain amount, yes"—if an untrained eye (estimator) looked at a pile of gravel and eutaw staked under the discharge pipe in the disposal area and failed to consider the finer materials submerged under water.[310]

The foregoing testimony of Mr. Rice also leads us to find the following operative factual circumstances to obtain, which we feel bears critically on the credence this court should give to the DDRs. First, we note that plaintiff failed to call Messrs. Hutchinson, Stringer, and Wright, who were its employees, and, failing such, did not explain these omissions. Certainly, their testimony, if consistent, would have corroborated the DDR on which they estimated the materials, and it would have also dispelled any misgivings of the court with respect thereto. Plaintiff also failed to proffer any *definitive evidence* regarding said persons' estimating qualifications, as well as the number of days each actually was at the disposal area and "eyeballed" his estimate of the various dredged materials.

In the same regard, while Mr. Rice's total testimony covers over 1,000 pages of the transcript, he failed to testify as to the number of days Messrs. Hutchinson, Stringer, and Wright were at the disposal areas, if any, at which time they effected "eyeball estimates" of the dredged materials. Moreover, Mr. Rice even failed to testify as to the number of days, out of the 818 dredge days, that he was actually present at a disposal area and effected "eyeball estimates" of the discharged materials. Mr. Rice also did not testify as to the reasons for the absence of the testimony of Messrs. Hutchinson, Wright and Stringer. While we note that Mr. Rice signed the majority of the DDRs, we do not find this circumstance to be conclusive or

even probative of the fact that he performed the "eyeball" percentage materials estimates for those days or even that he visited the disposal areas on such days.

Not surprisingly, plaintiff appears to rely on the credibility of Mr. Rice as supervisor and "sometimes estimator" to fill the gap in this regard. However, that argument is fundamentally flawed because the evidence is clear that Mr. Rice visited the site only two to four times a week, and was absent from the site for various indeterminant periods. For all we know, Mr. Rice was away from the site more than he was there. Evidence as to his continuous presence, and/or when, where, and how he trained his substitutes, as well as when and whether they were even present during *all* of his absences, is simply not in the record. That plaintiff clearly possessed this critical evidence can hardly be doubted. Why it did not present it we will never know. However, against this background, such a circumstance requires an inference that had plaintiff done so, said testimony would have been unfavorable to plaintiff's case and we so find. *Cf. The Steamer Southern Belle*, 59 U.S. (18 How.) 584, 15 L.Ed. 493 (1855); *Contract Master Services, Inc., et al. v. United States*, 225 Ct. Cl. 735 (1980); *Kavaros Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 9–10 (2d Cir.1978); *United States v. Fields*, 102 F.2d 535, 537–38 (8th Cir.1939); *Barnett v. United States*, 6 Cl.Ct. 631, 671 (1984). In view of the foregoing, we are constrained to conclude that plaintiff's daily dredge reports are inherently unreliable as creditable proof of the subsurface conditions actually encountered.

d. *Defendant's RUSCC 36 Admissions*

Despite plaintiff's many failures of proof with regard to subsurface conditions noted *supra*, we have yet to address the impact of certain admissions made by the defendant pursuant to RUSCC 36.[311] Shortly be-

---

**309.** Tr. at 1233.

**310.** Tr. at 1232.

**311.** RUSCC 36 provides:
"Rule 36. Requests for Admissions.

(a) Request for Admissions. A party may serve upon any other party a written request for the admissions, for purposes of the pending action only, of the truth of any matters within the scope of Rule 26(b) set forth in the request that relate to statements or opinions of fact or of the application of law to facts

fore the close of trial, plaintiff submitted to defendant a request, pursuant to RUSCC 36, for the admission of certain facts bearing directly on its burden of proof at trial. Plaintiff relies on two of defendant's responses to those requests for admissions in order to carry its burden relative to proof of having encountered *excess quantities of eutaw* (but *not* excess gravel or oversize gravel). The first of these is as follows:

> *Request for Admission No. 6:* Admit that Weeks dredged a total quantity of Eutaw of the project greater than that indicated by the contract boring logs.
>
> *Defendant's Response to Request No. 6:* Admits that Weeks *reported* a total quantity of Eutaw on the project greater than that indicated by the contract boring logs, within the pay template volume. (emphasis added).

Plaintiff claims that defendant's response is an unequivocal admission that Weeks encountered a differing site condition for excess eutaw.[312] On that utterance, we cannot agree. By its own terms, defendant's admission clearly does no more than admit that Weeks *"reported,"* or "stated," if you will, a greater quantity of eutaw than indicated on the boring logs. It merely confirms the fact that Weeks did, indeed, put forth, "report," or assert, figures depicting excess eutaw. This is clearly *not* the same as admitting that Weeks, in fact, *encountered* such conditions, or that the reported figures were in any way true or valid. We reject plaintiff's attempt to confuse what was clearly a careful choice of *words* by the defendant.

Plaintiff makes a similar claim with regard to a second alleged admission as well:

> *Request for Admission No. 7:* Admit that Weeks dredged a percentage of eutaw greater than that indicated by the contract boring logs.
>
> *Defendant's Response to Request No. 7:* Admits that Weeks dredged a percentage of Eutaw greater than that indicated by

the contract boring logs, within the pay template.

The parties are at odds regarding the meaning of defendant's somewhat ambiguous statement. The confusion stems from the extent to which the final phrase "within the pay template" delimits *where* the greater percentage of eutaw *was dredged,* compared to where the contract borings indicated it would be found. As discussed *supra,* the need for *symmetry* in identifying the correct contract site—for purposes of proving both expected and actual conditions—is perhaps the critical issue presented by this case. Defendant would argue that admission no. 7 does *not* establish the requisite symmetry, *i.e.,* that plaintiff dredged a greater percentage of eutaw *within the pay template.* Rather, defendant would contend that the admission relates to *all* the areas where plaintiff dredged eutaw, including overdredging. Plaintiff, on the other hand, would take the position that admission no. 7 admits that plaintiff dredged a greater percentage of eutaw "within the pay template." As noted, it is a question which depends on the extent to which the words "within the pay template" do or do not modify the phrase "dredged a percentage of eutaw greater."

While we find defendant's interpretation fully reasonable, we nonetheless cannot dismiss as unreasonable the interpretation of the plaintiff. Given this apparent ambiguity, we are forced by the standard principle of *contra preferentem* to construe this ambiguity against its drafter, the defendant. For this reason, we are constrained to agree with the plaintiff that defendant has admitted that Weeks encountered a differing site condition for excess eutaw. Accordingly, as RUSCC 36(b) requires:

> Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission.

To date, defendant has made no such motion to withdraw said admission. Based on

---

including the genuineness of any documents described in the request....

(b) Effect of Admission. Any matter admitted under this rule is conclusively established

unless the court on motion permits withdrawal or amendment of the admission...."

**312.** PPS at 135–36.

this admission, therefore, we are obligated to find, and we do so as a matter of law, that plaintiff "dredged a percent of Eutaw greater than that indicated by the contract boring logs, within the pay template."

█ Where this leaves the plaintiff with regard to element (iv), however, is not in as good a position as one might anticipate at first blush. This is so because, as the case law clearly requires, not only must the actual conditions *differ* from those indicated in the contract borings, but that difference must be *material* as well. As is plain from our quote of the defendant's admission *supra*, that admission is limited to establishing only that plaintiff dredged a "percentage of Eutaw greater" than indicated in the boring logs, but not necessarily one *materially* greater. This gap, in turn,

brings us back full circle to relying on the proven percentage of eutaw derived from the daily dredge reports to gauge its materiality. As noted *supra*, such data from the daily dredge reports, given the unique facts of this case, is inherently unreliable and, therefore, cannot serve as a basis to carry plaintiff's burden with respect to materiality. Accordingly, notwithstanding defendant's admission, plaintiff fails as to this element of its excess eutaw claim as well.[313]

### (v) *The Foreseeability of the Actual Subsurface Conditions Encountered*

The fifth element of plaintiff's differing site condition claim relates to whether or not the particular site conditions which

---

**313.** Through a reliance on allegedly "Contemporaneous, Internal Corps Documents," plaintiff also seeks to bolster its conclusion that the Corps in some way "admitted" or "confirmed" its differing site condition claims. We cannot ascribe to these documents the ultimate effect the plaintiff desires. In the case of excess eutaw, plaintiff's references, such as Plaintiff's Exhibits 64, 67 and 68, Defendant's Pretrial Submission para. 83, and the testimony of Mr. Jangula (Tr. at 2289–90), all say little more than defendant's admission no. 7, *i.e.*, that plaintiff encountered excess eutaw, or unanticipated eutaw, but none definitively resolves the question of materiality without further resort to the daily dredge report data. While several of these documents profess to recommend that plaintiff be compensated for this excess eutaw, these references are nothing more than the writer's opinion, without any corroborating evidence as to a *material amount* of excess eutaw. As such, they are yet insufficient proof for this court to find materiality as a matter of law.

In addition, we would note that all of the documentary references are taken from documents prepared, or evidence obtained, *prior* to the completion of plaintiff's project, and *prior* to when the reality of plaintiff's overdredging was fully uncovered (PX 64 dated 1981; PX 67 dated 1981; PX 68 dated 12/82, based on evidence obtained *during* the period of dredging). These particular references were therefore made *without* any of the authors knowing of the full impact of the overdredging or *where* the allegedly excess materials were actually encountered—within the contract site, or from the area of overdredging. On this basis, the probative value of these documents is greatly diminished by our current understanding of the true extent of plaintiff's *admitted* overdredging and plaintiff's complete inability to present any evidence on the precise conditions encountered exclusive-

ly within the contract site (maximum pay template).

The same is true with respect to plaintiff's alleged "Corp [ ] Admissions of Excess Quantities of Gravel" and "Oversize Gravel." True, the documents and testimony cited (PX 68; PX 62 [reports of 11/81]; PX 74; Tr. at 2231–38; 2227–28; 2262–63) suggest two Corps employees' bland opinions that Weeks was encountering unexpected or unanticipated excess quantities of gravel and oversize gravel. Once again, however, absent reliance on the daily dredge reports, there is no quantitative corroboration of the materiality element. Similarly, plaintiff's references are mostly to evidence obtained prior to the time the full extent of plaintiff's overdredging was known or understood (not true with respect to PX 74 and defendant's inspection of disposal sites revealing oversize gravel). These two circumstances, we believe, vastly diminish the significance of this evidence uncorroborated by reliable data of actual subsurface conditions within the maximum pay template, *i.e.,* the relevant contract site.

Lastly, there is plaintiff's reliance on PX 40, the Corps' test pit study, and PX 50, Dr. Kondner's test pit analysis. Plaintiff claims that the materials estimates derived from these studies of several exhumed disposal areas compares closely with the data contained on the daily dredge reports. The relevancy of this observation is quickly put to rest when one considers that the two test pit studies do no better job in segregating the materials taken from the maximum pay template from those encountered during overdredging than the plaintiff's own dredge reports. On this basis, we do not believe that the test pit studies, whatever their results, truly corroborate anything of import relative to the plaintiff's burden of establishing the precise conditions encountered exclusively within the maximum pay template.

were encountered were reasonably foreseeable based on the information which the contractor either possessed, or should have possessed through the exercise of due diligence. *Foster*, 435 F.2d at 888; *Vann*, 420 F.2d at 982; *United Contractors*, 368 F.2d at 594; *Clark*, 5 Cl.Ct. at 453; *Mojave Enterprises*, 3 Cl.Ct. at 357. Unlike our previous discussion of the contract indications, this test does *not* revolve solely around that information which the government provided in the contract documents. Rather, it depends critically upon *all* the information—including any reasonably discoverable *outside* information—which was available to the contractor at the time of bidding. *Hunt & Willett, Inc.*, 351 F.2d at 985–86; *Flippin Materials*, 312 F.2d at 414. Thus, to a large extent, what the contractor knew or should have known about the subsurface materials depends upon the reasonableness of its pre-bid site investigation. In this regard, while we generally cannot expect a contractor "to discover hidden subsurface conditions," *Foster*, 435 F.2d at 888, we must not ignore the fact that a reasonable site investigation may be a lesser or *greater* burden depending upon the unique facts and circumstances of each case.

Our primary concern under this element revolves around plaintiff's allegation that it was reasonably unforeseeable that it would have encountered any gravel substantially in excess of its 8.1% figure for expected gravel. We reject this contention based on the very same collateral facts regarding gravel in-flow and materials deposits which caused us to conclude that this 8.1% estimate was unreasonable in the first place. *See* discussion *supra*. In addition, we note for the record, but do not find, certain facts in evidence which would tend to suggest, contrary to the plaintiff's position, the possible existence of gravel in excess of one inch in size. Lastly, we are in accord with the plaintiff to the extent it alleges that a

reasonable contractor would not have foreseen quantities of eutaw in excess of those discernible from a reasonable interpretation of, and reliance on, the contract boring logs.[314]

Prior to our discussion of the foreseeability of each encountered condition *infra*, we begin with a brief review of the site investigation plaintiff undertook prior to preparing and submitting its bid. As is quite clear from Mr. Rice's testimony, plaintiff's site investigation was organized almost solely with a view toward resolving certain anticipated logistics problems. This preoccupation with logistics, in contrast to 'a concern over gathering information about subsurface conditions, is manifested rather persuasively by the scope of Mr. Rice's investigation. In this regard, the record reflects that Mr. Rice physically inspected roughly only one-third of the approximately 30–mile site; made his inspection by foot to only a few accessible portions of the river bank; failed to procure a boat to traverse the entire river channel and view all exposed portions of the river bank; failed to contact or interview any adjacent land owners, gravel operators, or other dredge contractors in reasonably contiguous portions of the river regarding subsurface materials; failed to visit or consult appropriate sources of public information established for the very purpose of gathering and maintaining geological and meteorological data for the Ten-Tom area, and even failed to consult with local Corps officials regarding what their experience may have been in overseeing past projects in the Ten-Tom area.[315] Against this background, it is not surprising that Mr. Rice himself described his method of investigating subsurface conditions as a "superficial inspection."[316]

### a. The Foreseeability of "Excess" Gravel

■ Plaintiff's estimate of 8.1% expected gravel was, therefore, based primarily,

---

**314.** This, of course, does not alter in any way our previous finding that plaintiff's bid estimates of *all* materials components were unreasonable due to its several assumptions and its failure to make appropriate adjustments to its bid for the risks associated with those assumptions. *See supra.*

**315.** Tr. at 1043–1101.

**316.** Tr. at 1081.

if not solely, upon its review and interpretation of the contract boring logs. Using only this information, as plaintiff did, we believe it was clearly foreseeable that plaintiff was going to encounter substantially more gravel than it anticipated. We reach this conclusion because of the impact of several collateral factors, all of which information would have been readily available to the plaintiff at the time of bidding had it conducted a reasonable site investigation.[317]

These facts to which we are referring have been discussed in detail *supra,* and will not be repeated here in detail. We believe it sufficient to state that the critical omission, *inter alia,* on the plaintiff's part was—not contacting the many surrounding gravel operators. The testimony indicates "any one" of these individuals could have told plaintiff of the significant tributary gravel flowing into the Ten-Tom at the north end of plaintiff's project site. More importantly, defendant's expert testified that they could have told Mr. Rice that this tributary gravel would most likely be found deposited along the *inside* banks of meanders in the river. Mr. Rice testified that he knew of these many operators, but gave no reasonable explanation as to why he did not contact them. The court is mindful of the fact that defendant did not call any gravel operators to testify regarding their operation and what they would have specifically told Mr. Rice regarding gravel had he inquired. However, given that there were numerous commercial gravel operators seeking profit therefrom, and the opinion of defendant's expert noted

*supra,* the inference is reasonable that substantial gravel deposits existed in the area.

Had he obtained all such relevant information, Mr. Rice could have readily determined that since the vast majority of Weeks' dredging in the northern half of the site consisted of dredging materials deposits along the inside banks of meanders in the river, large quantities of gravel would reasonably be anticipated. Moreover, using such information, he could also have readily observed that the boring logs were not a "snap shot" of these gravel build-ups because the gravel was deposited by the river flow itself, and not likely to show up in borings taken *inland* from the river banks. Mr. Rice did not adjust his bid to take into account these clearly foreseeable gravel deposits (which deposits likely account for why approximately 78% of the claimed excess gravel was found in the northern end of plaintiff's project) because he failed to act reasonably by investigating the surrounding gravel operations.

██ Plaintiff's failure to conduct a *reasonable* site investigation and contact the surrounding gravel operators is, in substance, not unlike the failure of the plaintiff to conduct *any* site investigation in the case of *Blauner Construction Company v. United States,* 94 Ct.Cl. 503 (1941). In *Blauner,* plaintiff sought an equitable adjustment due to changed conditions allegedly encountered while engaged in digging a building foundation. It had based its bid estimate of subsurface conditions *entirely* upon the drawings of four borings supplied by the government, and undertook no site investigation, despite a contract clause urging it to conduct a thorough one. When

---

317. Plaintiff consistently challenges this court's authority to decide for itself what a reasonable dredge contractor would or would not do by arguing that the proper test for reasonableness is the expert testimony of another dredge contractor. Plaintiff reasons that inasmuch as defendant did not call a "dredge contractor" or dredge expert, and plaintiff did, this court is somehow constrained to give conclusive effect to the plaintiff's expert's testimony on the question of reasonableness. Nothing could be farther from the truth. Our inquiry into what is reasonable conduct on the part of any contractor is a question of law, to be decided using our own independent judgment. Naturally, we may accept testimony as to what an alleged expert would or would not have done—but such testimony is not unassailable by the forces of objective *reason, logic, credibility,* as well as other *material* evidence which may come in through the mouth of a non-dredge expert. In sum, as a question of law, we are charged to make our own independent assessment of the reasonableness of the plaintiff's conduct whether or not defendant presents even one scintilla of evidence with respect thereto. We note that *Sternberger v. United States,* 401 F.2d 1012, 185 Ct.Cl. 528, 535–36 (1968), teaches that "[e]ven uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive."

Blauner allegedly encountered differing conditions which it could have discovered through a visit to the site, the court rejected Blauner's claim explaining:

> Plaintiff had ample notice and was warned in the specifications to visit the site of the proposed building, and the information given by the defendant before the bids were placed was simply for the purpose of letting plaintiff know of certain conditions which might be met upon excavation of the site. Defendant held nothing back from the plaintiff. There was no misrepresentation on the part of the defendant. There was simply a *miscalculation* on the part of the plaintiff of the difficulties to be encountered, *which could readily have been ascertained by a visit [as to Weeks a reasonable visit] to and examination of the site.*
>
> .... *Where a contractor has miscalculated, and, through its own negligence in not examining the site, has failed to take into consideration conditions which actually existed and which had been called to his attention in the specifications by a warning to visit the site, and sustains a loss, no claim arises.*

*Id.* at 510–11 (emphasis added; citations omitted). Like Blauner, Weeks relied *totally* on the information in the boring logs *unsupplemented* by critical evidence of "conditions which actually existed" which was readily available to it through a reasonable site investigation.[318] Thus, in the sense that Weeks *ignored* such critical evidence, its actions produced the same effect as those of the plaintiff in *Blauner* who failed to undertake any site investigation at all. Accordingly, *Blauner* represents sound authority to hold here that given Weeks' seriously deficient site investigation as to subsurface conditions, "no claim [for excess gravel] arises." *Id.*

In defending its site investigation, plaintiff has made much of the fact that the case law holds that a contractor need not conduct its own surveys or borings, nor hire its own geologist and geotechnical engineer. We thoroughly agree. *See Stock & Grove, Inc. v. United States*, 493 F.2d 629 (Ct.Cl.1974); *Morrison-Knudsen Co.*, 345 F.2d at 535. Plaintiff is, however, held accountable to discover and pursue reasonable indications, as here, which would put a reasonable and prudent contractor, experienced in dredging, on notice that there may be subsurface conditions different than those indicated in the contract boring logs. We believe that evidence of extensive commercial gravel operations, in such close proximity to plaintiff's site, was a significant factor constituting such notice (not to mention Mr. Rice's admitted knowledge of their existence).

Mr. Rice's failure to contact these commercial operators, contrary to the contentions of the plaintiff, has nothing to do with its failure to hire a geotechnical engineer. We agree that the case law holds, in that regard, that the contractor is not required to "reinvent the wheel." Rather, creditable evidence in the record establish-

---

318. Plaintiff was required, pursuant to General Provision 48, to undertake a thorough site investigation:

48. SITE INVESTIGATION (1965 JAN)

The Contractor acknowledges that he has investigated and satisfied himself as to the conditions affecting the work, including but not restricted to those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and conditions of the ground, the character of equipment and facilities needed preliminary to and during prosecution of the work. The *Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and subsurface* materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications made a part of this contract. Any failure by the Contractor to acquaint himself with the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any conclusions or interpretations made by the Contractor on the basis of the information made available by the Government. (ASPR 7–602.33)

PX 1 at General Provisions p. 13 (emphasis added).

es that this failure is due to Mr. Rice's own limited virgin cut experience in dredging river channels with significant gravel inflow like that in the Ten-Tom valley.[319] In any event, whatever the reason for plaintiff's failure to act reasonably under the circumstances, defendant's expert witness's opinion (Dr. Lang), based on his own experience in dealing with land owners and gravel operators, was that a simple inquiry would have been adequate to bridge any gap in the plaintiff's knowledge. Given the factual circumstances, we find this opinion totally credible. Accordingly, we do not believe it unreasonable to hold plaintiff accountable for failing to have undertaken such a simple task. *Cf. Foster*, 435 F.2d at 888; *Flippin Materials*, 312 F.2d at 414.

### b. The Foreseeability of "Oversize" Gravel

█ As with its estimated quantum of gravel expected, plaintiff's estimate of size of gravel expected was also based on the information contained in the contract boring logs. At trial, plaintiff stated that it expected to encounter 4 to 5 percent of one inch gravel, approximately one percent of one and one-half inch gravel, and minute amounts of two to three inch gravel.[320] From our review of the evidence in the record, we cannot point to any one fact which would have unequivocally put plaintiff on notice that greater sizes of gravel would be foreseeable. The only evidence to suggest this conclusion is the Corps' use of a 1 3/8-inch inside diameter split-spoon sampler to take the borings which would have precluded it from extracting and detecting gravel greater than 1 3/8 inches in size. The question is, fully knowing the critical fact that the Corps used such a device, should plaintiff, as a reasonably prudent contractor, have *expected* to find gravel greater than 1 3/8 inches in size?

Such an argument has been held to be a *non sequitor* by the Corps' own board of contract appeals. *Bernard McMenamy Contractors, Inc.*, ENG BCA No. 3413, 77-1 BCA ¶ 12, 335 at 59, 633-34. This argument has two sides, however. On the one hand, it is reasonable to argue that the Corps chose a 1 3/8-inch sampler because it anticipated a certain size of gravel. This leads up to the inference that the Corps knew something about the subsurface conditions prior to taking these samples. On the other hand, there is no conclusive creditable evidence that the Corps knew anything about the subsurface conditions (*i.e.,* gravel sizes), other than as manifested, when it chose the 1 3/8-inch sampler. And absent such, it would be arguably unreasonable for a contractor to assume this on its own and expect larger size gravel. While we do believe sampler size can, in some circumstances, be a positive indicator of expected subsurface conditions, the better approach is that no conclusive inference about the subsurface conditions can be drawn from the Corps' choice of sampler size absent some evidence to suggest that the Corps indeed knew something positively about the size of the gravel when it chose the 1 3/8 inch sampler. That fact the government has neither argued nor established. We thus find no probative evidence to warrant a conclusion that Weeks should have foreseen substantial oversize gravel.

### c. The Foreseeability of "Excess" Eutaw

Plaintiff's estimate of expected eutaw was similarly based on the information contained in the contract boring logs. It anticipated no eutaw beyond that which it perceived was indicated in the boring logs, and there is no creditable evidence to suggest that plaintiff should have anticipated more. While it is true that plaintiff misread one boring log to indicate no eutaw, when it in fact did indicate eutaw, this clerical error does not change the correctness of the plaintiff's ultimate conclusion, and the evidence in the record, that no further eutaw

---

**319.** Tr. at 935–41.

**320.** Tr. at 1103–05. We note that despite plaintiff's estimate of three to four inch gravel, it yet maintains that its expected gravel was based on the contract boring logs which Mr. Rice also

testified indicated gravel only up to one and one half inches in size. While we note this inconsistency for the record, the boring logs speak for themselves as to what size gravel was indicated thereon.

was foreseeable based upon information other than the contract boring logs.

The government disputes this estimate by arguing that Weeks should have foreseen excess eutaw based on Weeks' anticipated overdredging.[321] We reject this contention as incongruent with the theory of a differing *site* condition claim. Throughout this case, the government has correctly argued that a differing site condition claim is a comparison of conditions as expected *within the contract site*, and those actually encountered *within the [same] contract site*. Now, all of a sudden, the government stresses the foreseeability of excess eutaw below the maximum pay template, in the area of overdredging *outside* the contract site. Quite simply, it is irrelevant for purposes of proving what was foreseeable within the site (the relevant inquiry), to argue the foreseeability of conditions outside the site. While for purposes of its *own* bid estimate plaintiff might have found it helpful to consider such conditions if it anticipated overdredging, such conditions do not add to our essential inquiry here: the foreseeability of the anticipated versus encountered conditions *within the contract site*. Defendant's contention must be rejected.

(vi) *Were the Excess Costs Claimed Caused By The Materially Different Contract Site Conditions?*

▮ The sixth and final element of plaintiff's differing site condition claim is one which plaintiff itself does not specifically posture as a separate element. It is, however, one which plaintiff does address in its discussion of the "materiality" of the differing site conditions it encountered. Given the teaching of *Klingensmith, supra*, we adopt this criterion as a separate element, focusing expressly upon the question—whether the contractor has specifically proven that injury to it did, in fact, directly result from encountering the alleged differing site conditions. *See Saunders Construction Co. & Kay Kizer Construction Co. v. United States*, 618 F.2d 121, 220 Ct.Cl. 639, 641 (1979); *Stuyvesant Dredging Co.*, 11 Cl.Ct. at 858. In this

regard, we must be careful to focus only on those damages directly attributable to the alleged differing site condition, and not on those damages for which *concurrent causes*, stemming from the plaintiff's own making, are equally to blame. *Klingensmith*, 731 F.2d at 809. It is for the plaintiff to show, by probative evidence, *which* separate causes by the government result in *which* identifiable periods of delay, before it can be said that plaintiff has carried its burden with respect to causation. *Id.*

Plaintiff has attempted to prove its injury, due to the alleged differing site conditions, by arguing that any and all days worked *beyond* its *ex post facto* averred best time estimate of 413 days (estimated in June 1983) are compensable days attributable *collectively* to the four encountered differing site conditions (excluding, of course, the stump claim for which plaintiff has already been compensated, and the time extension due to flooding). Plaintiff arrives at its alleged residual uncompensated 195–day figure by working backward from the figure for total dredging days on the project (*i.e.*, 818 days), minus its *ex post facto* best time estimate had there been no differing site conditions (413 days), minus the stump claim extension (174 days), and minus the flooding extension (36 days). In essence, plaintiff is blandly arguing that—but for the collective effect of the four differing site conditions and the flooding, it would have completed the project in 413 days. Therefore, plaintiff concludes, inasmuch as the uncompensated differing site conditions were causes for which the government assumes liability, it is liable for the excess costs plaintiff incurred in those 195 days as a result of these causes. In theory, there is a certain fleeting logic to the plaintiff's position.

The problems with this "collective" reasoning approach, however, are many. First, the government has argued the existence of other *concurrent* causes, of the plaintiff's own doing, which it alleges caused the plaintiff to require the additional 195 dredging days to complete the project. If this is the case, even were there

---

**321.** DPB at 13–14.

merit to the other operative elements of plaintiff's differing site condition claims, we would be left with such a mixture of concurrent causes, that it would be impossible to find with any degree of reasonable certainty just how many of the averred 195 uncompensated days by proof in the record, manifest "a clear apportionment of the delay and expenses attributable to each party." *Klingensmith*, 731 F.2d at 809. This is so because plaintiff has failed to identify for the court a method whereby we can trace the impact of any *one* alleged differing site condition to the incurrence of any one identifiable excess cost. Nor has plaintiff provided its own breakdown of how many of the alleged uncompensated days are directly attributable to *each* of the differing site conditions, *independent* of the concurrent causes identified by the defendant, and we find none, absent rank speculation.

Defendant has argued three general categories of concurrent causes. The first is plaintiff's failure to dredge at production rates (measured in cubic yards of dredging per hour) even close to those rates it estimated and used in preparing its bid. The second is the lengthy record of work stoppages and delays occasioned by repairs to the dredge Venture. The third is the extensive amount of the plaintiff's admitted overdredging (at least 25%). We believe that given the undifferentiated nature of the plaintiff's proof, it is sufficient for defendant to overcome the plaintiff's showing of causation were only *one* of these three causes shown to be supported by the evidence. Such is the case because, as noted *supra*, plaintiff has provided no creditable evidence of the number of uncompensated days attributable to even one differing site condition independent of the alleged concurrent causes. On that basis, as discussed *infra*, we believe the evidence of plaintiff's substandard productivity rates to be a most persuasive concurrent cause sufficient in magnitude to persuasively discredit any notion that plaintiff could have attained the 413 (*ex post facto*) day anticipated completion schedule absent the alleged differing site conditions. Accordingly, any further discussion of defendant's other alleged concurrent causes is rendered unnecessary. (By this approach, we are not holding that the evidence is not probative regarding the remaining averred concurrent causes.)

The evidence regarding the productivity rates we rely on in order to find the existence of said concurrent cause derives from the plaintiff's daily dredge reports. It is the same evidence we described *supra* as inherently unreliable, and so highly speculative that it was incapable of serving as a probative basis for the plaintiff's claimed differing site conditions. It is critical to note, however, that what we state hereinafter does not *in any way* reflect a change of our finding as to the lack of credibility inherent in the daily dredge report data with regard to the quantum of each subsurface material actually dredged. However, with respect to the recorded production rate thereon, we simply assume for the sake of argument that even were this data as accurate as the plaintiff claims it is relative to the production rates actually obtained, it would, in fact, demonstrate the substandard productivity of the dredge Venture when compared with plaintiff's estimated rates. Our focus is, therefore, that even in giving the plaintiff the benefit of the doubt as to the accuracy of its actual production rate data, it nonetheless belies the plaintiff's assertion—that it could have completed the project in 413 days; and that, therefore, all uncompensated days are due to the existence of the alleged differing site conditions.

Productivity for a dredge project can be effectively measured by comparing the rates at which the contractor *expected* to dredge in order to complete the project within the estimated time frame, and those which the contractor *actually* obtained in the time it *actually* took to complete the project. In other words, the question is, using hindsight, was the plaintiff's *ex post facto* estimated completion days (requiring 413 days) a reasonable projection in terms of the productivity rates achieved versus those expected. We believe not. For the entire project, plaintiff's bid reveals an estimated overall production rate of approxi-

mately 859.33 cy per hour in dredging 8,255,555 cubic yards.[322] Plaintiff was able to achieve or better this rate on only 113 days out of the 608 *actual working* dredge days, or only 18.6% of the time.[323] This is far less than the average 50% figure one would expect given the plaintiff's bid figures.

The same is true for plaintiff's individual production rate for dredging gravel. Plaintiff's bid worksheets show expected rates for dredging gravel, depending upon the conditions of the cut, ranging from 455 to 750 cubic yards per hour.[324] At no time did plaintiff even come close to dredging large percentages of gravel (*i.e.*, 85% + gravel) at anywhere near 750 cubic yards per hour. In fact, on only three of the 20 days where plaintiff actually recorded 85% *or more* gravel did Weeks even dredge at a rate equal to or better than the *low end* of the range, 455 cubic yards per hour.[325] On the average, where plaintiff recorded dredging days encountering 85% or more gravel, the average of the daily production rates was approximately only 277.75 cubic yards per

hour, well below half the maximum expected rate of 750 cubic yards per hour.[326] Thus, it is important to note that while excess or unanticipated gravel may have added to the weak *overall* production rate, it is clear that this excuse still offers less than the *complete* picture in light of plaintiff's similarly substandard performance in dredging gravel itself.

A similar deficiency in productivity is exhibited with respect to plaintiff's production rates for dredging sand and clay. For sand, plaintiff's bid papers show an expected productivity rate of 1,500 cubic yards per hour, except for one cut area where plaintiff expected a sand productivity rate of 995 cubic yards per hour.[327] Plaintiff achieved (or bettered) the 1,500 cubic yards per hour rate on only *six* out of the 90 days where it dredged 85% + sand.[328] On the average, regarding those 90 days where plaintiff dredged 85% + sand, its rate was 830.13 cubic yards per hour compared to the expected figure of 1,500 cubic yards per hour.[329] Given the great disparity be-

**322.** See PX 22—estimated total cubic yards to be dredged by Weeks: 8,255,555 (8,360,175 cy—104,620 cy subcontracted out) divided by estimated total dredge hours for Weeks to complete its dredging: 9,607 (9,747—140 subcontracted out) = 859.33 cy per hour.

**323.** See PX 34; 608 dredge days (*i.e.*, 818 reported dredge days minus 174 days due to stump delay and 36 days due to flooding delay).

**324.** See PX 22.

**325.** Those three dredge report days were 4/29/81, 11/22/80, and 4/30/81. These figures are based on the court's own independent review of the daily dredge reports.

**326.** This figure was arrived at by averaging the daily rates for report dates: 9/21/81, 9/22/81, 9/23/81, 4/27/81, 4/29/81, 11/22/80, 5/12/81, 5/13/81, 5/16/81, 5/17/81, 5/18/81, 5/19/81, 5/20/81, 5/22/81, 5/26/81, 5/27/81, 5/28/81, 11/23/80, 8/3/81, and 4/30/81. The choice of 85% or greater gravel does not in any significant way detract from the comparison with plaintiff's estimated production rates for dredging 100% gravel. In fact, according to plaintiff's own testimony, gravel is harder and more time consuming to dredge than sand or clay, both of which accounted for the major balance of materials encountered on the reports cited. Thus, where we have used production rate figures for 85% or greater gravel, and 15%

to 0% of some other *easier* pumping material such as sand or clay, such productivity rate average would actually *overstate* the true 100% gravel production rate. In this case, if we have overstated the already weak actual production rate for gravel, it cannot be a source of prejudice to the plaintiff.

**327.** PX 22

**328.** PX 34 for report dates: 4/13/82, 10/12/80, 10/14/80, 10/16/80, 10/20/80, 9/26/80.

**329.** PX 34 for report dates: 4/5/82, 4/13/82, 4/14/82, 4/15/82, 7/1/81, 7/6/81, 8/9/81, 8/10/81, 8/13/81, 8/14/81, 8/15/81, 8/16/81, 8/17/81, 8/18/81, 8/20/81, 8/21/81, 8/24/81, 10/6/80, 10/7/80, 10/8/80, 10/9/80, 10/10/80, 10/11/80, 10/12/80, 10/13/80, 10/14/80, 10/15/80, 10/16/80, 10/17/80, 10/18/80, 10/19/80, 10/20/80, 10/23/80, 10/24/80, 5/22/80, 5/29/80, 2/1/82, 2/2/82, 2/3/82, 2/4/82, 2/5/82, 2/6/82, 2/7/82, 2/8/82, 2/10/82, 2/11/82, 2/12/82, 2/13/82, 2/14/82, 2/15/82, 2/16/82, 2/17/82, 2/18/82, 2/19/82, 2/20/82, 3/16/82, 3/17/82, 3/18/82, 3/19/82, 3/20/82, 3/21/82, 3/22/82, 3/23/82, 3/24/82, 3/25/82, 4/2/81, 4/4/81, 4/5/81, 6/15/81, 6/16/81, 6/17/81, 6/18/81, 6/19/81, 6/20/81, 6/21/81, 6/22/81, 6/23/81, 6/24/81, 6/25/81, 6/26/81, 6/27/81, 6/28/81, 6/30/81, 1/26/80, 1/27/80, 1/28/80, 3/5/80, 3/6/80, 9/25/80, 9/26/80.

tween the *actual* and *expected* production rates for sand, the actual rate based on 85% + sand can still be validly compared to plaintiff's expected bid rate which was based on dredging 100% sand. The sand production rate we have calculated where 85% + sand was dredged includes dredging some 0% to 15% of other, *less productive* materials such as clay, gravel and eutaw. However, even after adjusting for this fact by revising our 830.13 figure upward significantly by, say, 20%, the resulting production rate figure, 996.16 cubic yards per hour for dredging 100% sand, is still markedly *below* (an average 34%) the bid figure of 1,500 cubic yards per hour.

For dredging clays, plaintiff's bid worksheets show expected production rates ranging from 373 to 1,000 cubic yards per hour, with *most* cut areas registering in the 1,000 cubic yards per hour range.[330] At no time where plaintiff dredged 85% + clay (not eutaw) did it come close to dredging at the rate of 1,000 cubic yards per hour. In fact, our review of the daily dredge reports discloses plaintiff's highest productivity rate in dredging 85% + clay was only 635 cubic yards per hour.[331] On the average, plaintiff achieved a rate of 329.08 cubic yards per hour when dredging 85% + clay.[332] As with our calculation for sand, we note that this actual production rate for dredging 85% + clay includes dredging 0% to 15% of other materials— *predominantly easier ones such as sand,* as well as some harder ones such as gravel and eutaw. However, as before, the disparity between our actual (85% + clay) and plaintiff's expected (100% clay) figures for clay is so great even a reasonably generous upward adjustment in the 85% + clay figure to account for this fact of, say, 20%, leaves plaintiff with an actual production rate (adjusted for 100% clay) of 394.90 cubic yards per hour. This 394.90 cubic yards per hour figure is yet some 61% *less* than the expected production rate for 100% clay of 1,000 cubic yards per hour which plaintiff used in preparing its bid.

Lastly, there are the plaintiff's production rates for dredging eutaw. Plaintiff's bid papers reveal an expected productivity rate for dredging eutaw of 150 cubic yards per hour.[333] Quite astonishingly, plaintiff bettered this rate on seven of the eight days the DDR recorded dredging 85% + eutaw.[334] In fact, there was a day where plaintiff dredged eutaw at 1,700 cubic yards per hour and three days where plaintiff dredged eutaw at over 300 cubic yards per hour, over twice the expected rate.[335] Thus, where plaintiff's daily dredge reports reflected 85% + dredged eutaw, its production rate averaged 481.50 cubic yards per hour, which was over three times the anticipated rate of 150 cubic yards per hour.[336] As before, because our actual figure for 85% + eutaw also includes another 0% to 15% of other materials—this time *all easier* to dredge than eutaw—an adjustment *downward* needs to be considered. However, with such a great disparity between the actual (85% + eutaw) and expected (100% eutaw) production rate figures for eutaw, revising this figure downward to adjust for 100% eutaw by, say, 20%, still leaves plaintiff with a meaningful adjusted actual productivity rate for 100% eutaw of 385.2 cubic yards per hour, well over twice the expected figure.

In sum, the foregoing picture of approximate actual productivity rates versus expected rates tells an interesting story of what the dredge Venture was and was not capable of doing. Yet despite this proof, plaintiff still clings to its belief that it could have completed the project, but for the

---

330. PX 22.

331. PX 34 for report dated 11/13/80.

332. PX 34 for reports dated: 9/11/80, 9/13/80, 9/22/80, 9/23/80, 9/24/80, 1/19/80, 6/7/80, 11/13/80, 11/14/80, 11/15/80, 11/16/80, and 11/17/80.

333. PX 22.

334. PX 34 for reports 1/20/80, 4/27/80, 4/10/80, 4/28/80, 4/29/80, 10/29/80, and 10/30/80.

335. PX 34 for reports 4/27/80, 1/20/80, 4/10/80, and 4/29/80, respectively.

336. PX 34 for reports 1/20/80, 4/27/80, 4/10/80, 4/28/80, 4/29/80, 10/28/80, 10/29/80, and 10/30/80.

differing site conditions, in 413 days. This 413–day figure, however, was arrived at using the expected productivity rates for sand, clay, and gravel which we have just demonstrated the plaintiff did not come close to achieving, and the productivity rate for eutaw which plaintiff well exceeded. We believe this evidence demonstrates quite conclusively, and so find, that plaintiff could not have completed the dredge work in the *ex post facto* anticipated 413 days, and that, therefore, some substantial and undeterminable part of the alleged 195 uncompensated days *must be attributable* to days it utilized in completing the project in order to make up for this demonstrated lack of productivity. In short, and as is apparent, the plaintiff has provided this court no basis by which we can factor out the alleged uncompensated dredge days, due to substandard productivity, from those due to any alleged differing site conditions. Accordingly, whereas here, the plaintiff fails in this burden, *one of which the defendant and the case law made it well aware*, on the peculiar facts at bar, there can be no recovery. *Klingensmith*, 731 F.2d at 809.

### C. *Interest on the Now Settled Stump Claim* [337]

██ As its second cause of action, plaintiff seeks interest on a June 26, 1984 settlement award from the Corps which arose out of an equitable adjustment plaintiff filed in October of 1982 alleging a differing site condition for unanticipated stumps and logs encountered during dredging on the Ten-Tom project.[338] Plaintiff claims entitlement to this interest based on § 611 of the Contract Disputes Act, 41 U.S.C. §§ 601, 611 (1982) (CDA). In plaintiff's settlement of the stump claim, the Corps included interest in the amount of $345,965.15 covering the period from July 6, 1983 to June 30, 1984. This period corresponded to the day after which plaintiff formally certified its claim, to the date

---

**337.** We do not address the interest issue as to the other three differing site condition claims for the obvious reason that we have found no liability on behalf of the government for the underlying claim.

plaintiff was paid. Plaintiff contends this was error because interest should have been calculated from the date it submitted its claim in October of 1981, arguing that the CDA certification requirement was fulfilled at that time through the submission of a contemporaneous DD Form 633.

Defendant has objected to this claim on three grounds: (1) the Court of Appeals for the Federal Circuit has specifically held that the submission of a DD Form 633, contemporaneous with a claim, does *not* fulfill the certification requirement of the CDA; (2) plaintiff's settlement agreement is a binding accord, which has been satisfied through payment to the plaintiff and estops plaintiff from now seeking any additional interest on the settlement amount; and (3) FAR § 49.112–2(d) prohibits the government from paying interest on the amount due under a settlement agreement. Defendant is quite correct that in the case of *ReCon Paving, Inc. v. United States*, 745 F.2d 34 (Fed.Cir.1984), the Federal Circuit specifically held that a " 'Certificate of Current Cost or Pricing Data' [a DD Form 633] does not meet the requirements of Section 6(c)," the CDA certification requirement. *Id.* at 40. Thus, we need look no further for a basis to reject the plaintiff's claim for additional interest. *ReCon* bars the plaintiff's claim notwithstanding any decision we might reach as to accord and satisfaction, or the regulations. Therefore, we rest our decision rejecting plaintiff's claim solely upon the holding in *ReCon*.

### V. *Conclusion*

At first reading, our judgment in this case would appear to rest on multiple holdings involving numerous legal issues. A closer reading would reveal, however, that for all the detail, one definitive fundamental reason underlies our rejection of the plaintiff's petition for an equitable adjustment, *i.e.*, failure of proof. That failure of proof is seen most dramatically to the extent of plaintiff's reliance upon the daily

---

**338.** See DX 7 and DX 20.

dredge reports as conclusive proof of the *quantitative* conditions it actually encountered. As repeatedly stressed, we find that these reports are fatally tainted by the admission that the operative percentage of each material summarized thereon include *all dredged* material, both from within the contract site, *and in the area of admitted overdredging.* Consequently, they simply do not carry plaintiff's burden of proving— the quantitative conditions it actually encountered exclusively *"at the site."* Additionally, we have noted that these reports and their data are equally flawed due to the inherently unreliable and speculative nature of the *methodology* employed to prepare them, and the lack of critical probative evidence attesting to the qualifications and training of the various persons who had input in relevant data thereon.

Beyond the foregoing fundamental failure of proof, our findings have, nevertheless, dealt with other critical failures in the plaintiff's case. These include primarily the plaintiff's flawed attempt to rely on the alleged existence of contract indications as to the *quantum* of each type of subsurface material, *which did not exist;* the underlying unreasonableness of the plaintiff's conduct in preparing its bid and the failure to adjust for the risks associated with its several assumptions; the unreasonableness of the plaintiff's pre-bid site investigation and the failure to seek out information readily available to it from which a reasonable contractor would have foreseen its bid estimate for expected gravel was suspiciously low; and lastly, the dredge Venture's substandard productivity and the plaintiff's failure to provide a method of separating the delay due to this *concurrent cause* from the delay encountered due to the alleged differing site conditions.

Lastly, we have also rejected plaintiff's claim for interest on the stump claim settlement award as being barred by binding precedent of the Court of Appeals for the Federal Circuit.

For the reasons just noted, and all those reasons postulated *supra,* we are constrained to enter judgment for the defendant directing the Clerk to dismiss the plaintiff's petition with prejudice. Costs to the prevailing party.

IT IS SO ORDERED.